(No. 6461. August 31, 1937.)

GLENN I. MUNDELL, Appellant, v. C. A. SWEDLUND, Respondent.

[71 Pac. (2d) 434.]

E. B. Smith, for Appellant, filed no brief.

Earl E. Garrity, for Respondent, filed no brief.

J. W. Taylor, Attorney General and Ariel L. Crowley, Assistant Attorney General, J. R. Smead and Ralph S. Nelson, *Amici Curiae.*

AILSHIE, J.—Appellant is prosecuting an appeal from an order of the Industrial Accident Board, under authority of chapter 175 of the 1937 Session Laws (1937 Sess. Laws, p. 288.) Respondent has moved to dismiss the appeal on the ground that the act of the legislature (chap. 175, 1937 Sess. Laws) is invalid and void, for the reason and on the grounds, that the amendment of section 9, article 5 of the constitution, which was submitted to the electors and voted on at the 1936 election, was never submitted in the manner provided for in the constitution (sec. 1, art. 20); and that the vote, had thereon by the people, was void and the amendment never became part of the constitution.

The real and serious contentions made against the validity of the amendment are: First, that the proposed amendment was never entered on the journals of the House and Senate at the time of or prior to the taking of the yea and nay vote thereon, as required by sec. 1, art. 20 of the constitution, which provides:

"such proposed amendment or amendments shall, with the yeas and nays thereon, be entered on their journals";

and in the second place, it is contended that more than two amendments were proposed without being separately submitted, in violation of sec. 2, art. 20 of the constitution; and third, that the question submitted was duplicitous and am-

biguous. The resolution submitting the amendment passed the House of Representatives on February 9, 1935, and passed the Senate on February 16, 1935. The resolution, including the title, with submission and direction to the secretary of state, is as follows:

"CONSTITUTIONAL AMENDMENT

To be Submitted for Vote at General Election

November 3, 1936

"(H. J. R. No. 1)

"A JOINT RESOLUTION

PROPOSING AMENDMENT OF SECTION 9 OF ARTICLE 5 OF THE CONSTITUTION OF THE STATE OF IDAHO, AND SUBMITTING TO THE ELECTORS OF THE STATE FOR THEIR APPROVAL OR REJECTION THE QUESTION OF WHETHER SAID SECTION SHALL BE SO AMENDED AS TO PROVIDE THAT THE SUPREME COURT SHALL HAVE ORIGINAL AND APPELLATE JURISDICTION OF ANY ORDER OF THE INDUSTRIAL ACCIDENT BOARD.

*"Be It Resolved by the Legislature of the State of Idaho:*

'Section 1. That Section 9 of Article 5 of the Constitution of the State of Idaho be amended to read as follows:

"Section 9. ORIGINAL AND APPELLATE JURISDICTION OF SUPREME COURT. The Supreme Court shall have jurisdiction to review, upon appeal, any decision of the district courts, or the Judges thereof, and any order of the public utilities commission, *and any order of the Industrial Accident Board:* the legislature may provide conditions of appeal, scope of appeal, and procedure on appeal from orders of the public utilities commission *and of the Industrial Accident Board. On appeal from orders of the Industrial Accident Board the court shall be limited to a review of questions of law.* (Italics indicate amendatory matter.) The Supreme Court shall also have original jurisdiction to issue writs of *mandamus, certiorari,* prohibition, and *habeas corpus,* and all writs necessary or proper to the complete exercise of its appellate jurisdiction."

"Section 2. The question to be submitted to the electors of the State of Idaho at the next general election shall be as follows:

"Shall section 9 of Article 5 of the Constitution of the State of Idaho be amended so as to provide that the Supreme Court shall have original and appellate jurisdiction from orders of the Industrial Accident Board and that such appeal be limited to questions of law.

"Section 3. The Secretary of State is hereby directed to publish this proposed constitutional amendment for six consecutive weeks prior to the next general election in one newspaper of general circulation published in each county.

"Passed House February 9, 1935.

"Passed Senate February 16, 1935." (1935 Sess. Laws, p. 377.)

Addressing our attention to the first proposition urged, namely, the entry or failure to enter the proposed amendment, with the yeas and nays thereon, on the journals of the respective branches of the legislature, we find the following: The resolution was introduced in the House on the 24th day of January, 1935, and the entire history of the resolution as recorded in the journal, from the time of its introduction until it was transmitted to the Senate, is as follows:

"HOUSE JOINT RESOLUTION NO. 1, BY HENDRICKS, TURK, CURTIS AND THORNBURG

"Entitled, 'A Joint Resolution proposing amendment of Section 9 of Article 5 of the Constitution of the State of Idaho, and submitting to the electors of the State for their approval or rejection the question of whether said section shall be so amended as to provide that the Supreme Court shall have original and appellate jurisdiction of any order of the Industrial Accident Board,' was introduced, read the first time at length, and referred to the Reference Committee." (H. J. 92.)

"House of Representatives, Boise, Idaho,
"January 24, 1935.

"Mr. Speaker: We, your Committee on Reference, beg leave to report that we have had under consideration House

Joint Resolution No. 1 . . . . and recommend that same be printed.

"THORNTON, Chairman.

"Report adopted.

"House Joint Resolution No. 1 . . . . referred to Printing Committee." (H. J. 100.)

"House of Representatives, Boise, Idaho,
"February 4, 1935.

"Mr. Speaker:

"We, your Committee on Printing, beg leave to report that we have had correctly printed House Joint Resolution No. 1.

"GOSSETT, Chairman.

"Report adopted.

"House Joint Resolution No. 1 referred to State Affairs Committee." (H. J. 158.)

"House of Representatives, Boise, Idaho,
"February 5, 1935.

"Mr. Speaker:

"We, your Committee on State Affairs, beg leave to report that we have had under consideration . . . . House Joint Resolution No. 1, . . . . and recommend that they do pass.

"HYNES, Chairman.

"Report adopted.

" . . . . House Joint Resolution No. 1 . . . . filed for second Reading." (H. J. 170.)

"House Joint Resolution No. 1 was read the second time at length and filed for third reading." (H. J. 186.)

"February 8, 1935.

" . . . . House Joint Resolution No. 1 was read the third time at length and placed before the House for final consideration.

"Harn asked unanimous consent that House Joint Resolution No. 1 retain its place on the Calendar.

"There being no objection, the Speaker ordered that House Joint Resolution No. 1 retain its place on the Calendar." (H. J. 208.)

"House Joint Resolution No. 1 was read the third time at length, section by section, and placed before the House

for final consideration, the question being, 'Shall House Joint Resolution No. 1 pass?'

"Roll call resulted as follows:

"Ayes—Albrethsen, Anderson, Andrus, Boyle, Bradbury, Callaway, Cavanagh, Christensen, Coker, Curtis, Day, Dewey, Fry, Foreman, Goodwin, Graham, Handy, Harn, Harrington, Hendricks, Herrick, Hersley, Hove, Hussman, Haynes, Jensen, Jones, King, Klepfer, Leavitt, Lewis, Lind, Lindsay, Lusk, Meade, Meeker, Nelson, Powell, Powers, Ray, Ramey, Satterfield, Sharp, Snow, Talboy, Taylor, Thornburg, Thornton, Turk, Waddoups, Whittle, Wilson (Camas), Wilson, (Caribou), Wright, Mr. Speaker, Total, 55.

"Nays—None.

"Absent and not voting—Bailey, Barry and Siddoway, Total, 3.

"Excused—Gossett, Total, 1.

"Whereupon the Speaker declared House Joint Resolution No. 1 passed.

"Title was approved and House Joint Resolution No. 1 ordered transmitted to the Senate." (H. J. 220.)

The Senate Journal contains the following entries:

"House of Representatives, Boise, Idaho,
"February 9, 1935.

"Mr. President:

"I have the honor to transmit herewith House Joint Resolution No. 1, which has passed the House.

"RUDD, Chief Clerk." (S. J. 200.)

"House Joint Resolution No. 1, by Hendricks et al., was introduced, read the first time at length and referred to Judiciary Committee." (S. J. 202.)

"Senate Chamber, Boise, Idaho,
"February 13, 1935.

"Mr. President:

"We, your Committee on Judiciary, beg leave to report that we have had under consideration House Joint Resolution No. 1 and recommend that it do pass.

"DONART, Chairman,

"Report adopted.

"House Joint Resolution No. 1 filed for second reading."
(S. J. 219.)

"House Joint Resolution No. 1, by Hendricks, et al., was read the second time at length and filed for third reading."
(S. J. 237.)

"House Joint Resolution No. 1 was read the third time at length, section by section, and placed before the Senate for final consideration, the question being, 'Shall the resolution be adopted?'

"Roll call resulted as follows:

"Ayes—Adamson, Aikele, Baker, Barlow, Blake, Brookman, Choules, Clark, Connor, Donart, Erb, Friend, Gardner, Gibson, Glauner, Henderson, Hinton, Jenny, Just, Lafrenze, Loosli, May, Metcalf, Miller, Mitchell, Neil, Newport, Purcell, Rabdau, Rich, Ryan, Shimp, Stratton, Tapper, Whitten, Williams, Wilson, Yost, Total, 38.

"Nays—Burtenshaw, Reynolds, Woodward, Total, 3.

"Absent and not voting—Rigby, Total, 1.

"Excused—Dow, Peters, Total, 2.

"Whereupon the President declared the resolution adopted and ordered it returned to the House."   (S. J. 261.)

"House of Representatives, Boise, Idaho,
"February 19, 1935.

"Mr. President:

"I have the honor to transmit herewith . . . . House Joint Resolution No. 1, which have been signed by the Speaker."
(S. J. 286.)

On return of the resolution from the Senate the House journal records the following:

"Senate Chamber, Boise, Idaho,
"February 16, 1935.

"Mr. Speaker:

"I have the honor to return herewith House Bills No. 100 and 23, and House Joint Resolution No. 1, which have passed the Senate.

"MORRIS STACEY,
"Secretary of the Senate.

"House Bills No. 100 and 23, and House Joint Resolution No. 1 referred to Enrolling and Engrossing Committee." (H. J. 307.)

> "House of Representatives, Boise, Idaho,
> "February 19, 1935.

"Mr. Speaker:

"We, your Committee on Enrolled Bills, beg leave to report that we have had correctly enrolled House Bills No. 23 and 100, and House Joint Resolution No. 1.

> "CALLAWAY, Chairman.

"Report adopted.

"The Speaker announced that he was about to sign Enrolled House Bills No. 23 and 100 and Enrolled House Joint Resolution No. 1, and when so signed, ordered them transmitted to the Senate for the signature of the President.

"Unanimous consent having been granted, the House returned to the Fourth order of Business." (H. J. 319.)

"Mr. Speaker: I have the honor to return herewith Enrolled House Bills No. 23 and 100, and House Joint Resolution No. 1, which have been signed by the President.

> "MORRIS STACEY,
> "Secretary of the Senate.

"Enrolled House Joint Resolution No. 1 ordered transmitted to the Secretary of State." (H. J. 329.)

The question now recurs: Do the foregoing entries in the House and Senate Journals satisfy the command of sec. 1, art. 20 of the constitution, which requires that "such proposed amendment or amendments shall, with the yeas and nays thereon, be entered on their journals"? If the expression "entered on their journals" mean "in full," or "at length," or "at large," or "copied in the journals," then of course the foregoing entries of identification are not sufficient. If, however, the word "entered" as here used signifies a record or means of identification, then it must be admitted that these entries as above quoted are ample and sufficient.

It is contended that to "enter on their journals" means, to set forth in full a copy of the proposed amendment. We are unable to reach such a conclusion from the language employed. We are rather of the opinion that it was intended,

by this direction, to require the evidence that such a resolution is "agreed to by two-thirds of all the members of each of the two houses, voting separately" to be entered on the journals by some certain and definite *identification* together with the yea and nay vote, so that there may be record evidence of the vote and the identity of the proposed amendment. A resolution submitting a proposed amendment to the constitution may as well be *identified* in this way, without recording it at length and in full on the journals, as can a bill that reaches "final passage" on which the yea and nay vote "shall be entered upon the journal" (sec. 15, art. 3, const.); and yet so far as we are advised, it has never been the practice to make a journal entry of anything more than the vote and an *identifying reference* to the bill (sec. 15, art. 3, Const.) It is true that the constitutional mandate, with reference to the passage of bills, only requires the journal entry of the "yea and nay" vote on final passage, while the requirement as to journal entry of the submission of an amendment says: "such proposed amendment or amendments shall, with the yeas and nays thereon, be entered," nevertheless, it would ordinarily require no more detail or elaboration in the one case than in the other, to clearly disclose and identify the particular bill or resolution on which such "yea and nay" vote is recorded.

When our constitutional convention was held in 1889 it was composed of able and experienced men, some of whom were brilliant lawyers, able jurists and experienced men of affairs, who had already achieved distinction, and others who were on the way to success and later found their places in the United States Senate and House of Representatives and on the federal and state courts, and other positions and avocations requiring discretion and discernment. They evidently intended to make a distinction between the words "entered *on their* journals," used in sec. 1, art. 20, with reference to amendments, and the words "enter the objections *at large* upon its journals," as used in sec. 10, art. 4, with reference to reason for the veto of the Governor.

The California constitution contained the same requirement with reference to the submission of proposed amendments to the constitution as is contained in our constitution.

(Sec. 1, art. 18, Cal. Const. 1879; 1 Deering Codes, p. 67). This same question was presented to the California court in 1887, two years prior to the adoption of our constitution; and the court, speaking through Mr. Justice Temple, in the case of *Oakland Pav. Co. v. Tompkins*, 72 Cal. 5, 12 Pac. 801, 802, 1 Am. St. 17, discussed the meaning of the word "enter" as used in this connection, saying:

"If, for instance, the direction to enter the amendment in the journal is complied with, in some usual and popular sense of the language, either by copying the amendment into the journal, or by placing upon the journal an identifying reference only, either will do unless the context shows a different intention.

"Now, the word 'enter' primarily means to go in, or to come in, but has many derivative meanings, and is often employed in elliptical expressions, and is quite apt to be so used that the literal or most obvious meaning cannot be attributed to it. We read, for instance, in the laws of congress, that citizens may enter at the land-office a tract of land, and the expression is repeated in different forms many times. We are often told that a certain horse has been entered for a race, or an animal has been entered at a fair. What is really done in each instance is to make a record of certain important facts, for preservation or notice; and such is certainly a very ordinary meaning of the word 'enter,' when used in this derivative sense; that is, to register the essential facts concerning the thing said to be entered. And we think it may be fully admitted that the most natural and obvious meaning of the word, when employed in this derivative sense, is to copy without greatly affecting the argument.

"We find, near the title-page of nearly every book printed, that it has been *entered* in the office of the librarian of congress. What is really left with the librarian is the title-page of the proposed book, and this constitutes the entry, although, after it is printed, the author is now required to present a copy of the book for the congressional library. We sometimes read that a certain play of Shakespeare was entered at Stationers' Hall. We find that the entry really made was a brief identifying reference, preliminary to obtaining license to print. Such instances of the use of the word, and of the

phrase in which it occurs, might be multiplied indefinitely, but these are enough to show that this usage is quite common. Now, if we substitute, in all these and like cases, the word 'copy,' or the phrase 'enter at large,' for the word 'enter,' we are conscious at once that a great change has been made. Indeed, the mere fact that the qualifying words 'at large,' 'at length,' 'in full,' do so often accompany the word 'enter,' is proof that all feel that it is not a synonym of the word 'copy.' . . . .

"This is sufficient to uphold the amendment."

The foregoing excerpt from the California case was quoted with approval by the Supreme Court of Washington in *Cudihee v. Phelps,* 76 Wash. 314, 136 Pac. 367, and the court there said:

"It is argued that the words 'shall be entered on their journals' constitutes a mandatory requirement that the proposed amendment shall be recorded in full upon the journals, and that a reference to such an amendment, even though proposed in the form of a bill with a proper title as such, by its number and title set out in full, is not an entering upon the journals within the meaning of this constitutional requirement. It is apparent, then, that this branch of the case turns upon the meaning of the word 'enter' or 'entered' as used in section 1 of article 23 of the Constitution. . . . .

"Some cases have come to our notice involving constitutional provisions requiring proposed amendments to be 'entered in full' upon the legislative journals, but we think the decisions rendered under such provisions are of no aid here. We are of the opinion that the weight of authority, as well as the better reason, supports the view that it is sufficient compliance with our Constitution to enter upon the journals of the Senate and House reference to the proposed amendment, using the language of the title of the proposing act, as was done in the proposal of this amendment. We conclude that this amendment has not failed of lawful adoption because of the manner in which record thereof was made of its proposal by the Legislature."

Utah has constitutional provisions the same as ours with reference to amendments and in *Lee v. Price,* 54 Utah, 474, 181 Pac. 948, the supreme court of that state considered the

question as to the sufficiency of an entry on the journals to satisfy this constitutional requirement and said:

"This inquiry involves a construction of the language employed, 'such proposed amendment or amendments shall be *entered* on their respective journals.' (Italics ours.) The provision just quoted is mandatory, and if the verb 'entered' is synonymous with or means 'entered at large' or 'entered in full,' the constitutional provision has not been complied with. In our opinion, 'to enter' does not necessarily mean 'to copy' or 'to transcribe,' and to enter upon the journals does not imply that an amendment must be copied in full or entered at large upon the journals of both houses of the Legislature or of either of them. Among the framers of our state Constitution were lawyers, jurists, and publicists of signal ability and varied experience. Their work was done with care and deliberation. At the time the constitutional convention was in session (1895) the courts of last resort of California, Kansas, Nebraska, and Maryland had construed the phrase in question, and had held that a constitutional requirement that an amendment shall be 'entered' on the journals was sufficiently complied with by an entry on the journals of an identifying reference. Had the members of the constitutional convention not taken the view then entertained and indorsed by the courts of the states named they would certainly have made themselves clearly understood and would have said 'entered in full' or 'entered at large,' as they did in section 8 of article 7 of the Constitution in which it is required that when a bill passed by the Legislature is not approved by the Governor and is returned by the executive with his objections, the house it originated in 'shall *enter* the objections *at large* upon its journal.'"

In the foregoing case the Utah court cited with approval the two cases above mentioned from California and Washington. (*Oakland Pav. Co. v. Tompkins* has also been cited with approval in the following cases: *Thomason v. Ashworth,* 73 Cal. 73, 14 Pac. 615, 617; *Ex parte Ming,* 42 Nev. 472, 181 Pac. 319, 322, 6 A. L. R. 1216; *Boyd v. Olcott,* 102 Or. 327, 202 Pac. 431, 442; *State ex rel. Twichell v. Hall,* 44 N. D. 459, 171 N. W. 213, 215; *State ex rel. Adams v. Herried,* 10 S. D. 109, 72 N. W. 93, 95; *West v. State,* 50 Fla. 154, 39 So. 412,

415; *Johnson v. Craft*, 205 Ala. 386, 87 So. 375, 402; *Browne v. City of New York*, 125 Misc. 1, 210 N. Y. Supp. 786, 792.)

The constitution (sec. 1, art. 16) of South Carolina contains the same requirement as our constitution contains, with reference to entry of the amendment on the journals and the aye and nay vote thereon; and in *Weeks v. Ruff*, 164 S. C. 398, 162 S. E. 450, the supreme court of that state cited *Oakland Pav. Co. v. Tompkins, supra,* and approved the rule that ''an identifying reference, such as the bill number and purpose of the amendment, is sufficient'' entry on the journal to meet the constitutional requirement. (See, also, *Ex parte Ming, supra,* 6 A. L. R. 1216, and *Boyd v. Olcott, supra.*)

■■ It is a uniform rule adopted in this state, that, where a constitutional or statutory provision was adopted by the framers of the constitution or the members of the legislature from another state, which had already construed the provision prior to our adoption of it, it will be assumed that it was the intention of the framers or of the legislature to adopt the construction previously placed upon it by the courts of the state from which the provision was taken. (*Stein v. Morrison,* 9 Ida. 426, 457, 75 Pac. 246; *Shoshone County v. Proffitt,* 11 Ida. 763, 773, 84 Pac. 712; *O'Neill v. Potvin,* 13 Ida. 721, 732, 93 Pac. 20, 257; *Bank of Commerce v. Baldwin,* 14 Ida. 75, 81, 93 Pac. 504, 17 L. R. A. N. S., 676; *In re Niday,* 15 Ida. 559, 568, 98 Pac. 845; *In re Schriber,* 19 Ida. 531, 535, 114 Pac. 29, 37 L. R. A., N. S., 693; *State v. Anderson,* 31 Ida. 514, 523 (dissenting opinion), 174 Pac. 124; *Neil v. Public Utilities Com.,* 32 Ida. 44, 52, 178 Pac. 271.) The holding of the Oakland Paving Co. case is entitled, under the foregoing rule, to be given the same weight and judicial consideration as it would be given if it were a decision from this court on the same question. We hold that the *entry on the journal* was sufficiently full and explicit to identify the amendment and satisfy the requirements of the constitution.

■ This brings us to a consideration of the question as to whether the submission embraced ''two or more amendments'' within the purview of section 2, article 20 of the constitution. Much has been written by the courts and text-writers on this subject; some having concluded that the particular amend-

ment then being discussed dealt with plural subjects, while others held the proposal then under consideration comprised only one subject and matters essential or incident thereto. It is reasonable to hold, and the principle seems to be well settled, that where the question submitted to the people for vote involves an amendment or change in the constitution, even though it may contain what appears to be several or different questions, nevertheless, if they cannot be so intelligently divided that when submitted separately, any one might be approved and all the others rejected, and when so approved become effective and operative, then they should be submitted as one amendment; otherwise they should be submitted as separate amendments. In other words, if a proposed amendment, when divided up into two or more amendments, reduces the questions to such form that the voters might reject the main or controlling question and adopt the collateral or subordinate amendment or amendments, and thus leave the amendment or amendments so adopted useless or inoperative, or so incongruous as to upset or impair an existing system, then of course it follows that the whole matter should be submitted as one amendment.

Turning to the amendment proposed in this case, we find that it contains two outstanding features: The first and foremost is, to confer jurisdiction on the supreme court to hear and consider appeals taken directly from the industrial accident board to the supreme court; and secondly and incidental thereto, to limit that jurisdiction by the act of conferring it "to a review of questions of law" only.

Now, if we assume that the amendment be divided into these two questions and determine that they be submitted to the people for vote, the voters may adopt both, in which case the amendment would be operative and there would be no conflict or inconsistency between the two; but they might adopt the first proposition, conferring the appellate jurisdiction, and reject the second one, in which case there would be no conflict. The first would confer unqualified appellate jurisdiction on the supreme court. But suppose they would reject the first proposition and decline to confer appellate jurisdiction on the supreme court, and then adopt the second proposition, limiting the appellate jurisdiction of the supreme

court, "to questions of law." In such case the adoption of the second would be wholly futile, meaningless and inoperative.

The principal and primary purpose of the amendment under consideration was to provide for a direct appeal from the industrial accident board to the supreme court and thus obviate the circuitous method previously required of appealing from the board to the district court, and then requiring the dissatisfied party to appeal from the district court to the supreme court. The limitations of the jurisdiction on appeal to "review of questions of law" was merely a continuation in the amendment of what was already contained in the legislative act creating the board, prescribing its jurisdiction and authorizing an appeal. (Sec. 43–1408, I. C. A.)

It seems reasonable to assume that the inquiry as to the oneness of the question or subject matter submitted by a proposed amendment' should be determined in the same manner and by the same rule and course of reasoning by which the sufficiency of the title of an act of the legislature is determined, under sec. 16, art. 3 of the constitution, which provides that "Every act shall embrace but one subject and matters properly connected therewith, which subject shall be expressed in the title," etc. This course of reasoning was adopted in *Gabbert v. Chicago etc. Ry. Co.*, 171 Mo. 84, 70 S. W. 891, which case was cited with approval in *McBee v. Brady*, 15 Ida. 761, at 777, 781, 100 Pac. 97, 103. It is true that a resolution proposing a constitutional amendment is not "a formal 'act' or statute and does not require a title" (*Hays v. Hays*, 5 Ida. 154, 159, 47 Pac. 732) ; but the same reason ought to exist for determining the singleness of subject embraced in a legislative act as in determining whether more than one subject and essentially related matter is embodied in a single amendment.

Adoption of an amendment under the plan provided by our constitution (secs. 1 and 2, art. 20) requires two major acts of approval: First, the vote of the legislature, two-thirds of the members of each house voting separately, voting for the proposed amendment; so that in the first place the nature, scope and extent of the amendment must meet with

the approval of the legislature and be such as two-thirds of each house, voting separately, are willing and desire to submit to the electors for their approval or rejection. The second and final act is the approval of a majority of the electors of the state. On this second vote the people have no right to alter, change or modify the proposal as agreed to by the legislature and submitted to the electors for their approval or rejection. They may accept or reject the amendment as submitted. The fact, that some elector or group of electors would prefer to have had the submission in different form or of an entirely different nature, can make no difference when they come to cast their vote, except in so far as it may influence them in voting for or against the proposed amendment. Consequently, if the amendment submitted is not feasible or workable, that is primarily the fault of the legislature. The only remedy the voter has is to defeat the amendment.

The amendment now under consideration may well illustrate the foregoing statements. This amendment confers a limited appellate jurisdiction on the supreme court which it did not previously have; namely, the power to review questions of law on direct appeal from orders of the industrial accident board. An elector, who might have desired to confer unqualified appellate jurisdiction on the supreme court in such cases, was necessarily confronted with the question which he had to decide for himself, whether he would prefer conferring the limited jurisdiction proposed by the amendment or none at all, and consequently of voting for or against the amendment. This was not unreasonable nor was it contrary to the spirit of the constitution. If appellate jurisdiction was to be conferred by an amendment, it follows, as a necessary incident thereto, that such appellate jurisdiction must be either unlimited or qualified. The matter of qualifying the jurisdiction at the same time it was conferred was a proper part of the major subject of appellate jurisdiction.

The futility and danger as well of attempting to divide up a proposed amendment dealing with a substantial constitutional change, together with the necessary and essential subsidiary matters requisite to its successful operation or enforcement and the accomplishment of its purpose is illustrated by the

number of parts into which the attorney general has divided this amendment. In his brief he says:

"We find the question submitted embodies the following separate proposals:

"1. Proposal to grant original jurisdiction.

"2. Proposal to grant appellate jurisdiction.

"3. Proposal to limit appeals in 'original jurisdiction' cases to 'questions of law.'

"4. Proposal to limit appeals not in 'original jurisdiction' cases to 'questions of law.' "

It should be noted that each of these propositions, as stated by the attorney general, omits the major primary question, namely, "from orders of the Industrial Accident Board." These words added to each question give it a very different significance.

But, now suppose the legislature had intended to accomplish just exactly the things covered by the amendment here under consideration and in attempting to do so they had submitted four questions as stated by the attorney general and asked the people of the state to vote on them, allowing them the privilege of voting *for or against* any one, two, three or all of these propositions. The result might be the most unworkable, impossible and meaningless thing that could well be devised for conferring, dividing, withholding or qualifying jurisdiction in industrial accident cases. Suppose, for example, the electors had decided to defeat numbers 1 and 4 and approve 2 and 3. We would then have had the grant of appellate jurisdiction with the rejection of original jurisdiction, and at the same time with a limitation of power to consider anything but questions of law, in the exercise of "original jurisdiction." Or suppose the electors had rejected both 1 and 2 and refused to confer either original or appellate jurisdiction on the supreme court, and then approved 3 and 4. We would then have a refusal to confer jurisdiction of any kind on the supreme court and at the same time we would limit its jurisdiction, both original and appellate, to questions of law. Or again, suppose they had approved number 1 and rejected all the others, who could opine the status of the industrial accident board or the duties of the supreme

228

court under such circumstances? This would only create confusion without accomplishment.

The course of reasoning we have pursued and the conclusions we have stated are supported by the great weight of authority, as may be readily discovered by examination of the cases. This court discussed the issues as to whether more than one question was submitted by proposed amendment in *McBee v. Brady, supra,* and among other things, said:

"In discussing this question the supreme court of the state of Wisconsin in the case of *State v. Timme,* 54 Wis. 318, 11 N. W. 785, says:

" 'In order to constitute more than one amendment, the propositions submitted must relate to more than one subject, and have at least two distinct and separate purposes not dependent from or connected with each other.'

"This same rule seems to be recognized by the courts generally. (*In re Senate File 31,* 25 Neb. 864, 41 N. W. 981; *State v. Herried,* 10 S. D. 109, 72 N. W. 93; *Gabbert v. Ry. Co.,* 171 Mo. 84, 70 S. W. 891.)

"The determination whether a proposed change in the constitution constitutes one or more amendments, it seems to us, depends upon whether the change as proposed relates to one subject and accomplishes a single purpose, and the true test should be, can the change or changes proposed to be divided into subjects distinct and independent and can any one of them be adopted without in any way being controlled, modified or qualified by the other? If not, ([2]) then there are as many amendments as there are distinct and independent subjects, and it matters not whether the proposed change affects one or many sections or articles of the constitution."

As recently as 1934 the Supreme Court of Arizona in *Kerby v. Luhrs,* 44 Ariz. 208, 36 Pac. (2d) 549, 554, 94 A. L. R. 1502, had occasion to discuss this identical question and among other things, said:

"If the different changes contained in the proposed amendment all cover matters necessary to be dealt with in some manner, in order that the Constitution, as amended, shall constitute a consistent and workable whole on the general topic

---

([2]) Evidently the intention of the writer of the opinion was to use the word "so" instead of the word "not."

embraced in that part which is amended, and if, logically speaking,. they should stand or fall as a whole, then there is but one amendment submitted. But, if any one of the propositions, although not directly contradicting the others, does not refer to such matters, or if it is not such that the voter supporting it would reasonably be expected to support the principle of the others, then there are in reality two or more amendments to be submitted, and the proposed amendment falls within the constitutional prohibition. Nor does the rule as stated unduly hamper the adoption of legitimate amendments to the Constitution. Such a document was presumably adopted deliberately, after careful preparation, as a harmonious and complete system of government. Changes suggested thereto should represent the free and mature judgment of the electors, so submitted that they cannot be constrained to adopt measures of which in reality they disapprove, in order to secure the enactment of others they earnestly desire.''

In 1935 the court of appeals of Kentucky had under consideration a similar controversy and in *Curry v. Laffoon*, 261 Ky. 575, 88 S. W. (2d) 307, 308, quoted and adopted the holding of the Supreme Court of Montana in *State v. Alderson*, 49 Mont. 387, 142 Pac. 210, 212, Ann. Cas. 1916B, 39, as follows:

''The fact that an amendment can be separated into two or. more propositions concerning the value of which diversity of opinion may exist is not alone decisive. If, in the light of common sense, the propositions have to do with different subjects, if they are so essentially unrelated that their association is artificial, they are not one; but if they may be logically viewed as parts or aspects of a single plan, then the constitutional requirement is met in their submission as one amendment.''

In the McBee case this court quoted with approval from *State v. Timme*, 54 Wis. 318, 11 N. W. 785, as above noted and cited *State v. Herried,* 10 S. D. 109, 72 N. W. 93, in which latter case the Supreme Court of South Dakota had also quoted with approval from the Timme case.

On this phase of the case we conclude that if the thing or things proposed can be divided into questions distinct and independent so that any one of them can be adopted without

in any way being controlled, modified or qualified by the other, then there are as many amendments as there are distinct and independent questions or subjects.

This brings us to a consideration of the contention that the question submitted was ambiguous. This argument is based on the fact that the amendment itself makes no mention of vesting *"original jurisdiction"* in the supreme court on appeal "from orders of the Industrial Accident Board"; whereas the *question as submitted* and placed on the official ballot read:

"Shall section 9 of Article 5 of the Constitution of the State of Idaho be amended so as to provide that the Supreme Court shall have original and appellate jurisdiction from orders of the Industrial Accident Board and that such appeal be limited to questions of law."

In considering this phase of the case it should be borne in mind that the constitution does not contemplate that full information of the scope and effect of the proposed amendment shall be contained in the question placed on the ballot submitted to the voters for their approval or rejection. That information is to be derived from the publication of the proposed amendment required by the constitution. Art. 20, sec. 1, in full is as follows:

"Any amendment or amendments to this constitution may be proposed in either branch of the legislature, and if the same shall be agreed to by two-thirds of all the members of each of the two houses, voting separately, such proposed amendment or amendments shall, with the yeas and nays thereon, be entered on their journals, and it shall be the duty of the legislature to submit such amendment or amendments to the electors of the state at the next general election, and cause the same to be published without delay for at least six consecutive weeks, prior to said election, in not less than one newspaper of general circulation published in each county; and if a majority of the electors shall ratify the same, such amendment or amendments shall become a part of this constitution."

It was undoubtedly contemplated by the framers of the constitution, in requiring proposed constitutional amend-

ments to be published for at least six consecutive weeks prior to the election, that the voters would be thereby fully advised as to the nature, scope and effect of such proposed amendments and, therefore, nothing would need be contained in the question placed on the ballot other than sufficient description to identify the amendment proposed. Undoubtedly the question propounded to the voters in this case was sufficient for that purpose.

Of course, the question must not be so framed as to mislead the voter. (*Lane v. Lukens*, 48 Ida. 517, 283 Pac. 532.)

It is claimed that the question as submitted was confusing and misleading to the voters. We fail to see wherein or how it could have mislead or deceived anyone, for the reason that whether they chose to call it "original" or "appellate" jurisdiction, it was plain on the face of the question submitted that whatever the jurisdiction conferred might be called, it was "*from* orders of the Industrial Accident Board." In other words, the order, over which the jurisdiction was being conferred, *must first be made by the Industrial Accident Board* and whatever the submission might call the jurisdiction, it was in fact a jurisdiction to review orders first made by the board. There was no intimation in the question of submission *that the original hearings in industrial accident cases were to be in the supreme court* under this amendment. The voter could not have understood from this submission that anything was being done other than to confer direct, original appellate jurisdiction on the supreme court to review these appeals from the board and thereby eliminate the previous existing system of first appealing to the district court and thence to the supreme court; and this, in our judgment, was the reason for the use (unhappy as it was) of the word "original" in the submission and which nowhere appeared in the amendment.

Another thing which has been suggested and which might have had something to do with the use of the word "original" in the submission, is the fact that the headlines to sec. 9, art. 5 of the constitution, as printed in the annotated codes, contain that word; the headlines reading, "Original and appel-

late jurisdiction of Supreme Court." The appearance of the word "original" in this headline is clearly due to the fact that the section, at length, confers both the appellate and original jurisdiction possessed by the supreme court which includes "original jurisdiction to issue writs of *mandamus, certiorari,* prohibition, and *habeas corpus,* and all writs necessary or proper to the complete exercise of its appellate jurisdiction."

We are unable to discover wherein any elector could have been mislead into voting for the amendment by reason of the use of the word "original" in the submission or on account of the combined use of the words "original and appellate jurisdiction *from orders of the Industrial Accident Board.*" (Italics supplied.) It all amounted to the same things as unmistakably indicated by the question submitted and distinctly written in the proposed amendment.

It has also been urged against the validity of this amendment that no authorization was given by the legislature for its publication as required by sec. 1, art. 20, which says that the legislature shall "cause the same to be published without delay for at least six consecutive weeks, prior to said election," etc. The resolution (sec. 3) provides: "The Secretary of State is hereby directed to publish this proposed constitutional amendment for six consecutive weeks prior to the next general election," etc. There can be no doubt about this resolution *directing* the Secretary of State to publish the amendment. It was clearly intended to *"cause"* the amendment to be published. There is, however, authority for the assertion that this resolution did not carry the force and effect of a law. (*Hays v. Hays,* 5 Ida. 154, 47 Pac. 732; *Balderston v. Brady,* 17 Ida. 567, 577, 107 Pac. 493.) Admitting the correctness of this position does not sustain the assault made on this provision of the resolution. As noted, the constitution does not require that the legislature provide by legislative act for the publication of an amendment, nor does it prescribe the manner or method by which the legislature shall "cause the same to be published." (Sec. 1, art. 20.) We see no valid reason why the legislature might not as well "cause" the publication of a proposed amendment by resolu-

tion directing some state officer to look after the matter and see that publication be made, as to command it by formal statute. It would seem quite immaterial as to who handled the publication or as to how it was handled, or how the person who directed the same was ''caused'' to publish the amendment; the *essential thing was the publication,* and here there is no question but that publication was made as required by the Constitution. As to what might have been the liability of the secretary of state or could have been done about the matter, had he refused to make the publication, we express no opinion, as that question is not before us.

We hold that the amendment was submitted in substantial compliance with the requirements of the constitution and that this court has jurisdiction to hear the appeal.

The motion to dismiss is denied.

Morgan, C. J., and Holden, Budge and Givens, JJ., concur.