548 P.2d 35

**IDAHO WATER RESOURCE BOARD, an Agency of the State of Idaho, Plaintiff-Respondent,**

Idaho Power Company, a Maine Corporation, Intervenor-Respondent

v.

Donald R. KRAMER, as Secretary of The Idaho Water Resource Board, Defendant-Appellant.

No. 11803.

Supreme Court of Idaho.

March 10, 1976.

Rehearing Denied April 15, 1976.

William D. Collins, of Collins & Manly, Boise, for defendant-appellant.

Philip E. Peterson, Lewiston, Chapman & Cutler, Chicago, Ill., for plaintiff-respondent.

James E. Bruce, Paul L. Jauregui, Boise, for intervenor-respondent.

McQUADE, Chief Justice.

This action was initiated by plaintiff-respondent, Idaho Water Resource Board (hereinafter respondent) against defendant-appellant, Donald R. Kramer (hereinafter appellant), as Secretary of respondent, for the issuance of a writ of mandate to compel appellant to execute the joint application of respondent and intervenor, Idaho Power Company (hereinafter intervenor), with the Federal Power Commission for a power license to operate power generation facilities on the Snake River. The action was brought after appellant refused to execute the joint application although directed to do so by respondent. An alternative writ of mandate was issued by the trial court, ordering appellant to execute the joint application or to show cause why he should not do so. Subsequent to the issuance of this writ, the intervenor filed a complaint in intervention adopting the position of respondent as its own, and joining with respondent in asking that the alternative writ of mandate be made permanent. The trial court issued an order permitting the intervention. Appellant filed an answer setting forth his reasons for refusing to execute the joint application, and asking that the alternative writ be vacated and that the peremptory writ be denied. A hearing was held and findings of facts and conclusions of law were entered. The trial court entered final judgment in favor of respondent and intervenor, and against appellant, directing that a peremptory writ of mandate be issued, and ordering appellant and his successor in office to execute the joint application by affixing his signature to it. Appellant has appealed the trial court's judgment. We affirm the judgment of the trial court.

## BACKGROUND

Before addressing the assignments of error raised by appellant, it is necessary to chronologically retrace some of the pertinent legislative history which relates to this action. In 1964, art. XV of the Idaho Constitution was amended by addition of a new section to read as follows:

"§ 7. *State water resource agency.*— There shall be constituted a Water Resource Agency, composed as the Legislature may now or hereafter prescribe, which shall have power to formulate and implement a state water plan for optimum development of water resources in the public interest; to construct and operate water projects; to issue bonds, without state obligation, to be repaid from revenues of projects; to generate and wholesale hydroelectric power at the site of production; to appropriate public waters as trustee for Agency projects; to acquire, transfer and encumber title to real property for water projects and to have control and administrative authority over state lands required for water projects; all under such laws as may be prescribed by the Legislature."

In 1965, the Legislature enacted Chapter 320, Session Laws of 1965, codified at I.C. §§ 42–1731 to 42–1738, inclusive, establishing respondent as the constitutional water agency pursuant to the provisions of art. XV, § 7, of the Constitution, and providing for its organization, powers and duties. Also enacted was Chapter 319, Session Laws of 1965, codified at I.C. §§ 42–1739 to 42–1749, inclusive, authorizing the issuance of revenue bonds for the purpose of constructing water projects. Such bonds were to be payable solely out of revenues of respondent from special funds, and not from appropriated moneys.

## HISTORY OF THE SWAN FALLS– GUFFEY PROJECT

Prior to 1969, the United States Bureau of Reclamation developed a plan for the maximum use and development of the water, land and related resources of Southwestern Idaho. This comprehensive plan is known as the "Southwest Idaho Water Development Project." In September of 1969, intervenor submitted a proposal to respondent to partially fulfill a portion of this Bureau or Reclamation plan. Intervenor, who owned and operated a dam and power plant at the Swan Falls site on the Snake River pursuant to a Federal Power Commission license, proposed to respondent that they jointly reconstruct the existing Swan Falls dam and power plant, and construct a new dam and power plant downstream in the Guffey area to reregulate the flow from the reconstructed Swan Falls dam. Under this proposal, respondent was to construct and own the two dams and lease them to intervenor, who in turn was to construct and own all power generation facilities. The proposal provided for intervenor to make annual lease or rental payments to respondent. These payments were designed to cover respondent's costs for financing the construction of the dams. Any surplus funds available as a result of the intervenor's annual payments were to be applied by respondent for future irrigation development.

In 1970, the Legislature appropriated funds to prepare a feasibility study of hydroelectric development on the Grandview-Guffey Reach of the Snake River.[1]

---

1. As stated in Ch. 162, at 489, Ida.Sess.Laws (1970): AN ACT APPROPRIATING MONEY FROM THE GENERAL FUND TO THE WATER RESOURCE BOARD FOR THE PURPOSES STATED; AND DECLARING AN EMERGENCY. Be it enacted by the Legislature of the State of Idaho: "SECTION 1. There is hereby appropriated out of the general fund the following sums of money to the water resource board for the following purposes:

. . . . .

2. $150,000 solely for the purpose of making an independent economic feasibility study by the board of the proposed development of the Mountain Home division of the Southwest Idaho Water Development project. The study shall realistically examine in depth, not only the joint venture proposal as now

The feasibility study was prepared by International Engineering Company, Inc. of San Francisco, California, and consisted of an evaluation report dated October, 1970, and a supplemental evaluation study of Swan Falls-Guffey Hydro dated February, 1971. In essence, these reports reached the conclusion that either state ownership or the joint venture project proposed by the intervenor for the development of Grandview-Guffey Reach of the Snake River was feasible.

At a meeting held on January 18, 1971, respondent adopted a resolution whereupon it recited that it had reviewed the conclusions reached in the evaluation report for state or joint venture development of the dams at the Swan Falls and Guffey sites, and had concluded that the development of these dams would be in the public interest of the state and constitute optimum use of the state's water. It thereafter directed its staff and counsel to submit enabling legislation permitting either state or joint venture ownership at the next session of the Legislature, and directed that negotiations continue with the intervenor concerning the joint venture proposal and licensing by the Federal Power Commission of the proposed project.

Subsequent to the adoption of this resolution and during February of 1971, respondent, pursuant to the provisions of I.C. § 42–1734(b),[2] conducted a series of public hearings in connection with the preparation of a state water plan. These hearings were held in Mountain Home, Boise and Nampa, to consider the feasibility of developing dams at the Swan Falls and Guffey sites, and to discuss the alternatives of state versus joint venture development.

The Legislature in March of 1971, enacted Chapter 265, Sess.Laws of 1971, as amended by Chapter 270, Sess.Laws of 1971. As this legislation is crucial to the issues raised in this appeal, we set it out in its entirety Chapter 265 as amended:

SECTION 1. The legislature finds and declares that the development of the Grandview-Guffey Reach of the Snake River by the Idaho water resource board is in the public interest and that it is a public purpose that the Idaho water resource board exercise the powers authorized in sections 2, 3, 4, 5 and 6 of this act to:

(a) maximize the recreational potential, development of fish and wildlife habitat, and uses of the water resources of Idaho;

(b) facilitate irrigation of the arid lands of Idaho by providing means of utilizing the water resources of Idaho; and

(c) by contributing to the development of necessary electrical energy for use in the Ada-Canyon County area of southwest Idaho, achieve economy in the generation of electricity through the use of water resources thereby meeting the future power needs of the state of Idaho and its inhabitants.

SECTION 2. That the Idaho water resource board is authorized to plan, finance, construct, acquire, operate, own, and maintain a water project in the Grandview-Guffey Reach of the Snake River consisting of a dam or dams at sites known as Guffey and Swan Falls, or at such other sites in the Grandview-

offered by the board, but the feasibility of the joining of other participants or of the state of Idaho developing all of the features of the project. The study shall provide the determinants for a conclusion by the legislature as to all of the benefits of the proposed project and who the recipients will be."

2. I.C. § 42–1734(b) provides in part: *"Powers and duties.*—The board shall have the following powers and duties: (b) To progressively formulate an integrated, coordinated program for conservation, development and use of all unappropriated water resources of this state, based upon studies and after public hearings in affected areas at which all interested parties shall be given the opportunity to appear. . . ."

Guffey Reach of the Snake River as may be approved by the federal power commission, together with all necessary works and facilities for the generation and wholesale of hydroelectric power at the site of production in connection with such water project and together with all other necessary related structures and equipment, and subject to the provisions of this act, to negotiate and to enter into contracts for the wholesale of hydroelectric power at the site of production for sale of power generation of electric power and for the transmission thereof, and to make such plans and enter into such contracts and agreements as are necessary or appropriate for such construction or such joint ventures, including the acquisition of all necessary real and personal property in connection therewith, in joint, several, or segregated ownership, and, in addition to the powers elsewhere conferred on the Idaho water resource board, to issue and sell revenue bonds under the provisions of sections 42–1739 through 42–1749, Idaho Code, pledging thereto the revenues which the board shall derive from such water project, in order to pay its respective share of the costs of planning, financing, acquisition and construction, operation and maintenance of such water project, provided that the state or the state and the joint venturer shall petition the federal power commission for insertion of a license condition subordinating the project power right to future upstream depletionary use. All monies paid or property supplied by the Idaho water resource board for the purpose of carrying out the provisions of this section are hereby declared to be for a public purpose.

SECTION 3. In carrying out the powers granted by this act, if exercised in a joint venture with a privately owned electric utility company, or other entity, the Idaho water resource board shall be liable only for its own acts with regard to the financing, planning, construction, acquisition, operation, ownership, or maintenance of the water project, including jointly owned facilities, and in the event of a joint venture, any such agreement or contract providing for such joint venture shall so provide. No monies or other contributions to the joint venture supplied by the Idaho water resource board for the planning, financing, construction, acquisition, operation, or maintenance of jointly owned facilities shall be credited or applied otherwise to the account of any other participant in the joint venture.

SECTION 4. Any contractual agreement for power sale or joint venture shall be submitted to an interim committee for approval by a majority of such committee, if such committee is appointed and, in any event, subject to veto by action by the second regular session of the forty-first legislature; provided that, if no such veto takes place, the contract or contracts shall be in full force and effect according to the terms at the end of such second regular session of the forty-first legislature.

SECTION 5. The development of the water project authorized in section 2 of this act is hereby declared not to be subject to the policy expressed in the last sentence of section 42–1738, Idaho Code.

SECTION 6. Each resolution authorizing the issuance of revenue bonds of the Idaho water resource board for the purpose of planning, financing, acquiring, and constructing the water project authorized in section 2 of this act, and each agreement or contract if any there be, providing for a joint venture in the planning, financing, construction, acquisition, ownership, operation and maintenance of the facilities of the water project with a privately owned electric utility company shall provide that all surplus revenues of the Idaho water resource board derived from the facilities constituting the water project, after the payment of the costs of operation and maintenance expenses of the water project, the establishment and maintenance of a

fund for the payment of the principal of and interest on the revenue bonds as the same shall become due, the establishment and maintenance of adequate reserves therefor, and the establishment and maintenance of such contingency or other funds as the board deems desirable, shall in each year be paid by the Idaho water resource board into a fund to be established and held in the custody of the Idaho water resource board, to be known as the "Idaho Water Resource Development Fund" and shall, together with monies accruing to or earned thereon, be appropriated continuously, set aside, and made available until expended, to be used by the board in the administration of such fund and in the development of water and related land resources in the state of Idaho.

SECTION 7. This act and the provisions hereof shall be construed liberally to effectuate the purposes set out in section 1 of this act.

Respondent adopted two resolutions in 1971 subsequent to the enactment of Chapter 265, as amended. The first resolution, adopted in May of 1971, stated respondent had officially determined: (1) that the water project in the Grandview-Guffey Reach of the Snake River met the criteria set forth in I.C. § 42–1734(b)(1) to (5)[3] and would serve the public interest in constituting the optimum use of the water of the state; (2) that state participation in the project was essential to enhance the future development of the water and related land resources within the state, and (3) that the proposed development would fit into and be part of the state water plan then being formulated. The second resolution was adopted in October of 1971, and advised the interim committee[4] (appointed by the Legislature pursuant to section 4 of Chapter 265, as amended) that respondent had thoroughly reviewed the alternatives for state participation in the water project authorized in Chapter 265, as amended, and had concluded that the joint venture approach originally proposed by the intervenor would be preferable. On October 29, 1971, the interim committee advised respondent by letter, that it agreed with the conclusions expressed in its October resolution.

At a public meeting held on February 21, 1972, respondent passed and adopted a resolution entitled:

"*A RESOLUTION* authorizing the execution of an Agreement for the Financing, Construction, Ownership and Operation of the Swan Falls-Guffey Project drafted February 21, 1972, by and between Idaho Water Resource Board and Idaho Power Company, and directing submission of said agreement to the interim committee of the Forty-First Legislature of the State of Idaho for approval."

The agreement was submitted to the interim committee, and on February 25, 1972, was approved by a majority vote. The ap-

---

3. This statute provides in pertinent part: "*Powers and duties.*—The board shall have the following powers and duties: (b) . . . In adopting such program [an integrated coordinated program for the conservation, development and use of all unappropriated water resources of this state] the board shall be guided by these criteria: (1) Existing rights, established duties, and the relative priorities of water established in article 15, section 3, of the constitution of Idaho, shall be protected and preserved; (2) Optimum development in the interest of and for the benefit of the state as a whole shall be achieved by integration and coordination of use of water and augmentation of existing supplies for all beneficial purposes; (3) Adequate and safe water supplies for human consumption and maximum supplies for other beneficial uses shall be preserved and protected; (4) Subject to the primary use of water for the beneficial uses now or hereafter prescribed by law, minimum stream flow for aquatic life and the minimization of pollution shall be fostered and encouraged and consideration shall be given to the development and protection of water recreation facilities; (5) Watershed conservation practices consistent with sound engineering and economic principles shall be encouraged; "

4. *See* H.R.Con.Res. 20, 41st Idaho Legislature, 1st Reg.Sess. (1971).

proval of the interim committee was reported to the Second Regular Session of the Fourty-First Legislature on February 29, 1972.[5] On March 4, 1972, Senate Concurrent Resolution No. 124, which would have vetoed the agreement if adopted, failed to pass the Senate.[6] The Idaho Senate took no further action on the agreement during the remainder of the Second Regular Session. The Idaho House of Representatives did not take any action on the proposed agreement.

On March 22, 1972, the chairman of respondent advised the President of the Senate by letter, that the agreement had been formally executed by respondent and the intervenor on the previous day, pursuant to authorization of the respective boards of the contracting parties. This letter was read in its entirety to the Senate by its Secretary. The Second Regular Session of the Forty-First Legislature adjourned sine die on March 25, 1972. Pursuant to section 4 of Chapter 265, as amended, the agreement came into full force and effect as of the 25th of March, 1972.

To implement the agreement, respondent passed a resolution at a public meeting held on June 1, 1973, directing appellant to prepare, to sign and to present jointly with the intervenor to the Federal Power Commission, an application for licensing of the Swan Falls-Guffey Project. The chairman of respondent made further demand upon appellant to prepare the application in a letter dated July 5, 1973. Appellant refused to sign the joint application, and asserted in a letter dated July 30, 1973, addressed to the chairman of respondent, that his unwillingness to so comply was based upon his belief that the agreement was void and illegal. Additional demands made upon appellant to sign the joint application for a power license proved to be equally futile and unavailing. The intervenor has duly executed the joint application and appellant's continued refusal to comply with

respondent's request to sign the joint license application brought about this action.

## AGREEMENT

The agreement entered into between respondent and intervenor entitled "Agreement for the Financing, Construction, Ownership, and Operation of the Swan Falls-Guffey Project" was amended in October of 1974. This agreement, as amended, provides in essence that respondent will finance the construction of a dam and reservoir, to be known as Swan Falls Dam, on the Snake River and the construction of a new dam and reservoir, to be known as Guffey Dam, downstream from the Swan Falls Dam for the purpose of reregulating the fluctuating flows released by the Swan Falls Dam, including the acquisition of certain fish and wildlife facilities and the recreational facilities in the vicinity of the Swan Falls Dam and the Guffey Dam (The Swan Falls Dam, the Guffey Dam, the fish and wildlife facilities and the recreational facilities are hereinafter referred to as the Project), by issuing revenue bonds (Bonds) secured by the revenues to be derived by the respondent from lease payments from the intervenor for the lease of the Swan Falls Dam and the Guffey Dam to the intervenor. This agreement, as amended, further provides that the intervenor will finance the construction of and own the electrical power generating facilities to be constructed in connection with the dams. (The Project and the power plants to be constructed by the intervenor are hereinafter collectively referred to as the Swan Falls-Guffey Project).

In addition to this agreement, a lease agreement was entered into, whereupon respondent agreed to lease the two dams, but not the fish and wildlife and recreational facilities, to the intervenor for a total lease payment which is to include principal and interest payents due on the Bonds, and a

5. *See* S.Jour. for the Second Regular Session of the Forty-First Legislature for February 29, 1972 at 173–174.

6. *Id.* for March 4, 1972, at 189.

Development Fund Payment and an Additional Development Fund Payment. The latter two payments are to be used by respondent in connection with the future construction of one or more of the projects set forth in the "Southwest Idaho Water Project Development Plan" of the United States Bureau of Reclamation in Southwestern Idaho, or in connection with one or more water projects involving irrigation in the service area of the intervenor within the State of Idaho.

Finally, an indenture of trust for the issuance of the bonds to finance the cost of constructing the Project was entered into between respondent and a trustee bank.

Appellant raises twenty-two assignments of error in this appeal which we have consolidated into eleven major contentions.

## I.

Appellant argues that the trial court erred in making the following findings of fact:

1. The finding of what constituted the maximum use and development of water resources in southwest Idaho.

2. The finding that the "Southwest Idaho Water Project Plan in Southwestern Idaho" as used in section 10.6 of the agreement, as amended, referred to and meant the "Southwest Idaho Water Development Project" of the Bureau of Reclamation.

3. The finding that respondent complied with the hearing requirements as set forth in I.C. § 42–1734 on the feasibility of the Swan Falls-Guffey Project.

4. The finding that respondent complied in all respects with I.C. § 42–1734(b), (*l*) and (m).

We will address these assertions in the order presented.

■ The trial court found as follows with regard to appellant's first contention:

### IX.

"Prior to 1969, the United States Bureau of Reclamation developed a plan for the maximum use and development of the water, land and related resources of Southwest Idaho, which is known as the Southwest Idaho Water Development Project. A summary of the report of the Bureau of Reclamation on the Southwest Idaho Water Development Project was received in evidence as Plaintiff's Exhibit 30.

### L.

"The Project and the Swan Falls-Guffey Project constitute a water project for a public purpose in that they will maximize the recreation potential, development of fish and wildlife habitat and uses of water resources of Idaho, will facilitate irrigation of the arid lands of Idaho by providing means of utilizing the water resources of Idaho, and will both contribute to the development of necessary electrical energy for use in the Ada-Canyon County area in Southwest Idaho, and achieve economy in the generation of electricity through the use of water resources, thereby meeting the future power needs of the State of Idaho and its inhabitants."

Appellant does not contend that there is insufficient evidence to support these findings. Rather, appellant maintains it was error for the trial court to make these findings because the question of whether or not maximum use and development of the state's water resources was being obtained by the Swan Falls-Guffey Project was not in issue in the litigation. We do not agree with this assertion because the very essence of the Swan Falls-Guffey Project is to maximize the use of water.

■ Secondly, appellant assails the following finding of fact made by the trial court as being without basis:

### XLV.

"The 'Southwest Idaho Water Project Plan in Southwestern Idaho', as used in Section 10.6 of the Agreement, as amended, refers to and means the 'Southwest Idaho Water Development

Project' of the Bureau of Reclamation, as set forth in Plaintiff's Exhibit 30; the Southwest Idaho Water Development Project of the Bureau of Reclamation, as set forth in Plaintiff's Exhibit 30, has not been officially abandoned; and the Southwest Idaho Water Development Project and the Southwest Idaho Water Project Plan in Southwestern Idaho, as used in Section 10.6 of the Agreement, as amended, are well-established and defined terms, well known to the Plaintiff, the Intervenor and the public."

Appellant argues that the "Southwest Idaho Water Project Plan in Southwestern Idaho" as used in section 10.6 of the agreement, as amended, without definition thereof, does not necessarily mean that project developed by the Bureau of Reclamation and introduced into evidence as respondent's exhibit 30. It is appellant's view that if such was the intent of the parties, then the agreement, as amended, should have referred to the plan as developed by the Bureau and used specific language to refer to that report. We are not persuaded by this argument.

■ A finding of fact made by the trial court will not be disturbed on appeal where it is supported by substantial and competent evidence.[7] A review of the testimony adduced at trial, and the exhibits introduced as evidence, disclose that the term "Southwest Idaho Water Project Plan in Southwestern Idaho" as used in section 10.6 of the agreement, as amended, had a definite meaning, understood by the parties to the agreement to refer to the plan of the Bureau of Reclamation as set forth in respondent's exhibit 30.

■ Thirdly, appellant disputes the trial court's finding that hearings were held on the feasibility of the Swan Falls-Guffey Project in the areas which would be primarily affected by it as required by I.C. § 42–1734. The trial court found:

### XVII.

"During February 1971 the Plaintiff, pursuant to the provisions of Section 42–1734(b), Idaho Code, in connection with the preparation of a state water plan, upon proper notice, conducted a series of official public hearings to consider the feasibility of the development of dams at the Swan Falls and Guffey sites and the alternatives of state versus joint venture development. Such hearings were held in Mountain Home, Boise and Nampa, being in those areas which would be primarily affected by the construction of the Swan Falls-Guffey Project and by its inclusion in the state water plan, and all interested parties were given the opportunity to appear and present written and oral material. Such hearings, as to the Swan Falls-Guffey Project, in all respects comply with and satisfy the duty of the Plaintiff set forth in Section 42–1734, Idaho Code, in connection with the formulation of an integrated, coordinated program for conservation, development and use of all unappropriated water resources of the state, to hold public hearings in affected areas at which all interested parties shall be given an opportunity to appear."

Appellant concedes that hearings were held in three communities (Mountain Home, Boise and Nampa) all in geographical proximity to the proposed Swan Falls-Guffey Project. However, he submits that holding hearings solely in the above mentioned areas did not constitute compliance with I.C. § 42–1734. His position is that to comply with this statute, hearings should have been held throughout the service area of the intervenor, which extends to such communities as Riggins, Twin Falls, Idaho Falls and Salmon, i. e., several hundred miles beyond the area in which hearings were conducted. In appellant's view, the area affected by the Swan Falls-Guffey

---

7. *See* I.R.C.P. 52(a); *Thompson v. Fairchild*, 93 Idaho 584, 468 P.2d 316 (1970); *Hyde v. Lawson*, 94 Idaho 886, 499 P.2d 1242 (1972); *Baker v. Ore-Ida Foods, Inc.*, 95 Idaho 575, 513 P.2d 627 (1973).

Project encompasses the entire service area of the intervenor because the Swan Falls-Guffey Project will generate electric power for use throughout this service area, and surplus money deposited in a development fund under the agreement, as amended, may ultimately be utilized to finance future irrigation projects in this service area. We find this argument to be without merit.

I.C. § 42–1734(b) provides in pertinent part:

"42–1734. *Powers and duties.*—The board shall have the following powers and duties: . . . (b) To progressively formulate an integrated, coordinated program for conservation, development and use of all unappropriated water resources of this state, based upon studies and after public hearings *in affected areas at which all interested parties shall be given the opportunity to appear*. . . ." (Emphasis added)

We construe this provision as requiring respondent to conduct public hearings only in those areas of the state which will be subject to the most immediate and direct impact from each project proposal submitted to the state water resource board for possible incorporation into its state water plan. The record discloses that the Swan Falls-Guffey Project will produce its primary and direct effect upon Elmore, Owyhee, Canyon and Ada Counties. Public hearings with proper notice were conducted in these areas which afforded the people in those counties an opportunity to be heard. Thus, the hearing requirement found in I.C. § 42–1734(b) was complied with in this case.

One of the primary purposes of the Swan Falls-Guffey Project is to increase the production and availability of electrical energy to the citizenry of the state. Obviously, an increase in the electrical power output of the intervenor will affect in some incidental fashion all those serviced by it. However, to require public hearings in every area of the state where the intervenor provides service would be unduly burdensome and contrary to the spirit of

I.C. § 42–1734(b). Therefore we do not read into I.C. § 42–1734(b) a requirement that public hearings be conducted throughout the intervenor's service area before a proposal can be included in the state water plan.

■ Fourthly, appellant contends that respondent failed to comply with I.C. § 42–1734(b), (*l*), and (m) and therefore he attacks the following finding of fact made by the trial court:

## LII.

"The Plaintiff, by filing Plaintiff's Exhibit 29, with the Governor and the Legislature in November of 1970 has complied with all requirements of Section 42–1734(m) of the Idaho Code in connection with the financing and construction of the Project, and by inclusion of the Swan Falls-Guffey Project in the state water plan on May 7, 1971, and by inclusion of the Swan Falls-Guffey Project in the interim state water plan report published in July 1972, has complied with all requirements of Section 42–1734(b) and (*l*), Idaho Code, in connection with the financing and construction of the Project, and the denials and contentions set forth in subparagraphs A and B of paragraph XVII of the Defendant's Answer to the Alternative Writ of Mandate are untrue and without foundation in fact and do not show cause for the denial of a Peremptory Writ of Mandate."

Appellant maintains that: (1) pursuant to I.C. § 42–1734(b) and (*l*), respondent could not recommend to the Legislature the proposed Swan Falls-Guffey Project until it had developed a comprehensive state water plan, and; (2) in accordance with I.C. § 42–1734(m), respondent was required to submit a final report containing the complete plans, cost and feasibility estimates for the Swan Falls-Guffey Project before the Legislature could act upon it. Appellant argues that at the time the Swan Falls-Guffey Project proposal was submitted to the Legislature for its consideration,

respondent had not developed a state water plan, and furthermore that the report submitted to the Legislature on the Swan Falls-Guffey Project was deficient because complete plan and cost estimates had not been obtained. We do not agree with these assertions.

As previously set out in this opinion, I.C. § 42–1734(b) requires that respondent " . . . *progressively* formulate an integrated, coordinated program for conservation, development and use of all unappropriated water resources of this state . . . " [Emphasis supplied.] To progressively formulate a plan implies that the plan is to be adopted over a period of time, in stages, in a continuous step by step manner, and not in one complete act. At the time the Swan Falls-Guffey Project was being studied by the Legislature, respondent was in the process of developing an integrated and coordinated state water plan. An interim state water plan was published in July of 1972, which included the Swan Falls-Guffey Project. While it is true respondent had not officially adopted a final state plan at the time the Swan Falls-Guffey Project was being reviewed, we do not construe I.C. § 42–1734(b) as requiring that this be done prior to the time a water project, approved by respondent as part of its proposed state water plan, could be submitted to the Legislature for its consideration.

I.C. § 42–1734(*l*) provides:

"When a comprehensive state water plan is adopted, copies thereof shall be filed in the office of the governor and director of the department [of water resources], and published and distributed generally,"

This statute simply requires respondent to make available to the governor and the public at large, copies of a state water plan as soon as it is formally adopted. It lends no support to the first part of appellant's fourth contention.

As to the second part of appellant's fourth contention, I.C. § 42–1734(m) provides:

*"Powers and duties.—*

The board shall have the following powers and duties: . . . (m) To present to the governor for presentation to the legislature not later than the 30th (of November) of each November prior to the convening of a regular legislative session the final report containing the complete plans, costs and feasibility estimates for any water project which the board recommends that the state construct in accordance with the multiple use water resource policy and plan; and to construct any water project specifically authorized by the legislature."

A review of the record discloses that an evaluation report was prepared by the International Engineering Company, Inc. at respondent's behest, on the development of the hydroelectric potential of the Grand View-Guffey Reach of the Snake River. A copy of this report was submitted to the Governor in November, 1970, and shortly thereafter, before the 30th of the month, to the Legislature for its consideration.[8] As set forth in chapter I of the report, the following subject matter was surveyed:

An evaluation of alternative hydroelectric projects.

Determination of alternative financial arrangements between the State and Idaho Power Company (IPCo) to establish the most beneficial arrangement for State participation.

The technical and economic data necessary for State participation in joint licensing with IPCo of a hydroelectric development on the Snake River.

The basis for revenue bond financing of all or a portion of the project facilities.

An indication of the possible extent of State participation in the financing of water resource development, as a result

---

8. A supplemental evaluation report was prepared by the same company in February of 1971 which brought up-to-date flow depletion data on the Snake River.

of the implementation of a hydeoelectric project.

Assistance to the IWRB (Idaho Water Resource Board) in determining alternative sources and costs of power for the irrigation pumping connected with the project.

We therefore conclude that this comprehensive study, submitted by respondent to the Legislature for its perusal within the statutorily prescribed time deadline, was sufficient to comply with the requirement set forth in I.C. § 42–1734(m).

## II.

Appellant contends that art. XV, § 7 of the Idaho Constitution, pursuant to which respondent was created and its powers delegated, is void and of no force or effect because it incorporated into a single amendment four distinct and separate proposals, which were submitted to the electorate of this state as a single amendment, in violation of art. XX, § 2 of the Constitution. We do not agree with this argument.

Art. XX, § 2 provides in pertinent part: "*Submission of several amendments.*—If two or more amendments are proposed, they shall be submitted in such manner that the electors shall vote for or against each of them separately."

This constitutional provision first received judicial scrutiny in *McBee v. Brady,*[9] when this Court explained the purposes behind the enactment of art. XX, § 2:

"This provision of the Constitution is a wise one, and is intended to prevent several inconsistent and conflicting propositions from being submitted to the voters in the same amendment, and forcing the voter to approve or reject such amendment as a whole."[10]

The Court further commented:

"... it was evidently the intention by this provision to require that propositions which were incongruous or which did not relate to the same subject-matter or have the same object and purpose, should be considered as separate amendments."[11]

In *McBee,* the Court was asked to decide whether a state constitutional amendment which proposed to repeal two sections of the Constitution, and to amend five others was violative of art. XX, § 2. The Court read the proposed constitutional amendment to contain five different propositions:

"First, to abolish the probate court and extend the jurisdiction of the district court to all matters of probate; second, to provide for the election and appointment of judges; third to provide for the salaries of judges; fourth, to provide for the terms of said courts; and, fifth, a system of districts."[12]

To determine whether the incorporation of these changes into a single constitutional amendment complied with art. XX, § 2, the following test was established:

"The determination whether a proposed change in the Constitution constitutes one or more amendments, it seems to us, depends upon whether the change as proposed relates to one subject and accomplishes a single purpose, and the true test should be, can the change or changes proposed be divided into subjects distinct and independent, and can any one of which be adopted without in any way being controlled, modified or qualified by the other? If not, [sic, so] then there are as many amendments as there are distinct and independent subjects, and it matters not whether the proposed change affects one or many sections or articles of the Constitution."[13]

The Court utilized this test and went on to find that the proposed amendment was in-

---

9. 15 Idaho 761, 100 P. 97 (1909).

10. *Id.* at 772, 100 P. at 101.

11. *Id.* at 779, 100 P. at 103.

12. *Id.* at 778, 100 P. at 103.

13. *Id.* at 779, 100 P. at 103.

valid because it incorporated in a single amendment multiple distinct and independent propositions, " . . . any one of which could have been adopted by the electors, and its *efficiency or completeness not have been in any way modified or qualified by a failure to adopt any one or more of the other questions.*" [14] (Emphasis added.)

The test first announced in *McBee* has been consistently followed in subsequent decisions, although this Court has over the years indulged in various rephrasings of the standard to be applied. In *Mundell v. Swedlund,*[15] an amendment to the Constitution was proposed which would have conferred jurisdiction on the Supreme Court to hear appeals from the Industrial Accident Board, but limited this jurisdiction to a review of questions of law only. The proposed amendment was challenged as being violative of art. XX, § 2. In answering the attack, the Court stated the rule to be followed:

"It is reasonable to hold, and the principle seems to be well settled, that where the question submitted to the people for vote involves an amendment or change in the Constitution, even though it may contain what appears to be several or different questions, nevertheless, if they cannot be so intelligently divided that, when submitted separately, any one might be approved and all the others rejected, and when so approved become effective and operative, then they should be submitted as one amendment; otherwise they should be submitted as separate amendments. In other words, if a proposed amendment, when divided up into two or more amendments, reduces the questions to such form that the voters might reject the main or controlling question and adopt the collateral or subordinate amendment or amendments, and thus leave the amendment or amend-

ments so adopted useless or inoperative, or so incongruous as to upset or impair an existing system, then of course it follows that the whole matter should be submitted as one amendment."[16]

Applying the above mentioned standard, the Court upheld the amendment. The Court observed that had the proposed amendment been submitted to the voters as several separate questions:

"[T]he result might be the most unworkable, impossible, and meaningless thing that could well be devised for conferring, dividing, withholding, or qualifying jurisdiction in industrial accident cases."[17]

The Court further noted the futility and danger of attempting

" . . . to divide up a proposed amendment dealing with a substantial constitutional change, together with the necessary and essential subsidiary matters requisite to its successful operation or enforcement and the accomplishment of its purpose . . ."[18]

In reaching its conclusion, the Court quoted with approval from the *McBee* case.

In *Keenan v. Price,*[19] the Court was faced with a challenge to an amendment to § 1 of art. IV of the State Constitution which proposed to increase the term of each constitutional officer from two to four years, to require that the officer's residency be maintained in Ada County and to provide that the governor could not succeed himself in office except after the lapse of a full term. The argument was made that the proposed amendment contained four distinct amendments, none of which depended on the other.

After a lengthy review of the historical background surrounding the adoption of art. XX, § 2, and a thorough analysis of the meaning attached to this provision by this Court in past decisions, and by

14. *Id.* at 779–80, 100 P. at 103–104.

15. 58 Idaho 209, 71 P.2d 434 (1937).

16. *Id.* at 224, 71 P.2d at 441.

17. *Id.* at 227, 71 P.2d at 443.

18. *Id.* at 226, 71 P.2d at 442.

19. 68 Idaho 423, 195 P.2d 662 (1948).

courts from sister states, the Court announced the following standard for reviewing challenges under art. XX, § 2:

"The test for duplicity in a constitutional amendment, when viewed in the light of cases on the subject, is not that the matters contained therein might be divided and submitted in separate questions, but that they are incongruous and essentially unrelated."[20]

What constituted "related" matters was:

" . . . for the legislature to determine in the first instance when it proposed an amendment, and if there is any reasonable basis or theory upon which such determination is founded, and the same is not arbitrary or capricious, its judgment in that regard should be respected." [21]

Applying the test, and cognizant of the reasoning of previous decisions faced with similar constitutional challenges to amendments to the State Constitution the Court concluded that only one amendment had been submitted to the voters.

"It is difficult to imagine how a proposed amendment could be drawn by the legislature to get the exact wording the Constitution would have as amended by the people, if four questions had to be submitted here as contended for by plaintiff, unless all carried at one election. The practical effect would be to render it extremely difficult, if not impossible, to ever amend the Constitution unless each particular change were proposed and submitted at different succeeding elections."[22]

In *Penrod v. Crowley*,[23] the validity of a constitutional amendment which proposed to amend art. V, § 22 of the State Constitution, by providing for the selection rather than the election of justices of the peace, and for broadening their jurisdiction was challenged as being in violation of art.

XX, § 2. The Court rejected the challenge, cited with approval the *McBee, Mundell* and *Keenan* cases, and found that:

"[I]t was within the discretion of the legislature to submit these two propositions to the electors in one proposal. Such submission [for the selection of Justices of the Peace, and for fixing their jurisdiction by statute] did not violate art. 20, § 2, since both are germane to the common object and purpose [of improving the administration of justice in the courts of justices of the peace]." [24]

■ Application of the principles established in the aforementioned cases compels us to conclude that submission of art. XV, § 7 to the electorate for its approval, did not violate the restriction found in art. XX, § 2. Art. XV, § 7, provides for:

1) the creation of a state water resource agency,

2) authorizes this agency to formulate and implement in the public interest a plan for the optimum development of the state's water resources and,

3) grants to this agency the power to carry out these duties by empowering it to:

a) construct and operate water projects,

b) issue revenue bonds without state obligation, to be repaid from revenues of projects,

c) generate and wholesale hydro-electric power at the site of production,

d) appropriate public waters as trustee for agency projects, and

e) acquire, transfer and encumber title to real property for water projects, and to have control and administrative authority over state lands required for water projects.

The propositions found within this amendment all relate to a singular objective or

20. *Id.* at 454, 195 P.2d at 681.

21. *Id.*

22. *Id.*

23. 82 Idaho 511, 356 P.2d 73 (1960).

24. *Id.* at 521, 356 P.2d at 79.

purpose, i. e., the creation of a single state agency with the responsibility and authority to oversee and regulate the orderly development of the water resources of this state. These propositions do not have separate and distinct purposes, but are dependent and related to each other. Their association together within one amendment is not artificial or incongruous. They are all germane to a common plan of promoting the beneficial control and development of an important state resource.

Appellant contends in his brief that art. XV, § 7, embodies the following separate and distinct proposals.

1) whether there should be a constitutionally created agency with the authority to formulate and implement a state water plan for the optimum development of the water resources of the state with authority to regulate that development,

2) whether there should be a state agency authorized to appropriate unappropriated water for projects that the agency would construct,

3) whether art. IX, § 7, should be amended to remove from the elected officials of the state the direction, control and disposition of the public lands of the state to the extent that the same are needed for water projects, and

4) whether art. VIII, § 1, should be amended to provide for the issuance of revenue bonds for water projects developed by the state without limitation as to:

 a) the term of the bonds and

 b) the holding of an election and obtaining approval of a majority of the electors.

To have submitted these propositions in four separate amendments as appellant proposes, with the attendant possibility of some being adopted and others being rejected, would have "created the confusion without accomplishment" that this Court sought to avoid in *Mundell*. Unlike the *McBee* case, where the Court found that the efficiency or completeness of the amendment would *not* have been in any way modified or qualified by a failure to adopt any one of the propositions in that amendment, here the opposite is true. While this Court is cognizant of its responsibility to guard against and indeed strike down the submission to the electorate in the guise of one amendment, two or more distinct propositions that are so disconnected or independent of each other as to have no direct relationship to a general subject matter, we are not faced with such a prospect in this case.

III.

Appellant argues that the trial court erred in concluding that respondent was properly created despite the restrictions appearing in art. III, § 19, and art. XI, § 2 of the State Constitution which prohibit the creation of corporations by special legislative act. Appellant urges this Court to adopt the reasoning of the *State Water Conservation Bd. v. Enking*,[25] whereupon a legislative act creating an entity with powers similar to those granted to respondent, was declared to be unconstitutional because it violated the constitutional prohibition against the creation of a corporation by special law. We do not agree with appellant's argument, and hold that to the extent the *Enking* case is inconsistent with the conclusion we reach in this case, it must be overruled.

This Court recently had the opportunity to review a constitutional challenge similar to that raised in this assignment of error. In the case of *Board of Com'rs v. Idaho Health Fac. Auth.*,[26] a legislative enactment which created an "independent public body politic and corporate" known as Idaho Health Facility Authority, for the pur-

25. 56 Idaho 722, 58 P.2d 779 (1936).

26. 96 Idaho 498, 531 P.2d 588 (1975).

pose of making tax-exempt revenue bond financing available to the public and private non-profit hospitals within this state, was challenged as being in contravention of art. III, § 19, and art. XI, § 2 of the State Constitution. After a review of prior cases where this challenge had been advanced, the Court established the following two prong test to be applied in this area:

"It would appear then that the main distinction between a prohibited corporation under Article 3, § 19, of the Idaho Constitution, and a permissible 'independent public body politic and corporate' under the doctrine of the *Musgrave, Lloyd, Wood* and *Boise Redevelopment Agency* cases are (1) the absence of the private parties with the right to control the entity or to manage it, and (2) the inability of private parties to change the fundamental structure and public purpose of the entity as set out in the law creating it. These features set them apart from corporations within the meaning of Article 3, § 19, or Article 11, § 2." [27]

The Court in applying the test concluded that neither art. III, § 19, nor art. XI, § 2, was violated by the creation of the Idaho Health Facility Authority because: (1) its members were appointed by the governor; (2) it could not choose its own governing body; (3) it was subject to public control; and, (4) it was restricted to a narrow range of permissible public goals with a narrow means of achieving them.

In reaching this conclusion, the Court criticized the *Enking* case:

"The *Enking* case dealt with the creation of a state board which had power, among other things, to appropriate to itself the waters of the state not yet appropriated. The board had contended that it was an administrative arm of the state. If that were so, then the Court reasoned that the appropriation of water by it would be in violation of Article 15,

§ 3, of the Idaho Constitution. Having thus concluded that the board could not be a state agency, the Court held that the board was a corporation that had been created by special act in violation of Article 3, § 19, and Article 11, § 2. There was no reason or authority given for the Court's declaration of this dichotomy that all state-created entities were either unconstitutionally created corporations or agencies of the state." [28]

The Court added:

"Yet, the Court in *Enking* concluded that the board was a corporation because it could not be a state agency. Again, the case gave no definitive answer to the question of how a corporation differs from a state agency, and it based its ruling upon the assumption that every state-created entity was either an agency of the state or a corporation." [29]

The Court then concluded:

"The dichotomy urged in *Enking* was rejected in *Musgrave*. Thus, under the doctrine of the *Musgrave* case there are state-created entities which are neither corporations nor state agencies subject to all the restrictions of the state constitution." [30]

A careful scrutiny of the *Enking* case compels us to agree that this criticism was warranted.

 Applying the two prong test enunciated in *Idaho Health Fac. Auth., supra,* to this appeal, we conclude that the respondent is not a corporation within the meaning of either art. III, § 19, or art. XI, § 2. Appellant acknowledges in his brief that the second prong of the standard has been satisfied, and makes no argument on that point. Appellant does contend that the first prong of the test has not been met. He argues that the joint venture arrangement between respondent and the intervenor will establish an Administrative Committee, consisting of representatives from both respondent and intervenor, to

27. *Id.* at 507, 531 P.2d at 597.

28. *Id.* at 506, 531 P.2d at 596.

29. *Id.*

30. *Id.* at 507, 531 P.2d at 597.

manage and control the Project. In appellant's view this amounts to the creation of an entity (the Administrative Committee) by the Legislature, which gives to a private party (intervenor) the right of control and management over respondent. We cannot agree with this assertion.

Article III of the agreement, as amended, provides for the creation of an Administrative Committee. The purpose of this Committee is set forth in Section 3.1 of the agreement, as amended:

> "As a means of securing effective cooperation and of dealing on a prompt and orderly basis with various administrative, technical, financing, construction, ownership and operating problems which arise in connection with the performance of this agreement, the parties will establish an 'Administrative Committee' hereunder."

The creation of such a Committee to expedite the completion of one project engaged in by respondent does not amount to a divestiture of public control over respondent's total operations. The Committee exists as a joint cooperative effort to minimize the problems associated with this Project. It does not exist to dictate or to determine the future direction that respondent will take in carrying out its constitutional mandate.

## IV.

Appellant contends the trial court erred in concluding that chapter 265, as amended, and the joint venture agreement, as amended did not constitute:

(a) the creation of a state debt in violation of art. VIII, § 1 of the Idaho Constitution;

(b) a violation of the due process under art. I, § 13 of the Idaho Constitution;

(c) a lending of the credit of the state contrary to art. VIII, § 2 of the Idaho Constitution;

(d) an abridgment of the police powers of the state, or a denial to the people of their rights under art. XI, § 8, of the Idaho Constitution."

We will address this assignment of error in the order presented.

Appellant maintains that the method of financing the cost of constructing the Project creates an impermissible state debt or liability, in violation of the limitation on incurring state obligations contained in art. VIII, § 1. Appellant contends this is so because the joint venture agreement, as amended, contemplates the issuance of revenue bonds, in an amount in excess of two million dollars and for a term greater than twenty years, without requiring prior approval of the electorate. Appellant places primary reliance upon two cases to substantiate his position, *Feil v. City of Coeur d'Alene* [31] and *State Water Conservation Bd. v. Enking.*[32] We believe the *Feil* case is distinguishable. To the extent the *Enking, supra,* case is inconsistent or contrary to the conclusion we reach, it is overruled.

Art. VIII, § 1 provides in pertinent part: *"Limitation on public indebtedness.*—The legislature shall not in any manner create any debt or debts, liability or liabilities, which shall singly or in the aggregate, . . . exceed in the aggregate the sum of two million dollars, except in case of war, to repel an invasion, or suppress an insurrection, unless the same shall be authorized by law, for some single object or work, to be distinctly specified therein, which law shall provide ways and means, exclusive of loans, for the payment of the interest on such debt or liability as it falls due, and also for the payment and discharge of the principal of such debt or liability within twenty years of the time of the contracting thereof, and shall be irrepealable until the principal and interest thereon shall be paid and discharged. But no such law shall take effect until at a general election it shall have been submitted to

---

31. 23 Idaho 32, 129 P. 643 (1912).

32. *Supra,* note 25.

the people, and shall have received a majority of all the votes cast for or against it at such election, and all moneys raised by the authority of such laws shall be applied only to specified objects therein stated or to the payment of the debt thereby created, and such law shall be published in at least one newspaper in each county [,] or city, and county, if one be published therein, throughout the state for three months next preceding the election at which it is submitted to the people. The legislature may at any time after the approval of such law, by the people, if no debts shall have been contracted in pursuance thereof, repeal the same."

It is conceded that the bonds to be issued by respondent will be in excess of two million dollars, have not been submitted to the voters for approval, and the term for repayment exceeds twenty-years. Therefore, if the bonds to be issued are a "debt or liability" as those terms are used in art. VIII, § 1, the method for financing the project is prohibited by the Idaho Constitution.

▮▮▮ Art. VIII, § 1 of our Constitution,

". . . was adopted for the protection of the people against the pressure that might be brought to bear on the members of the Legislature for excessive appropriation for the various state institutions, internal improvements, and various other objects and purposes. It was intended to protect the new state from oppressive taxation and bankruptcy such as had befallen other states that had no such protection as a debt limitation in

their Constitutions. It is a wholesome and salutary safeguard, and no other provision of the Constitution should appeal more forcibly to the courts than this." [33]

As used in art. VIII, § 1 of the State Constitution, a "debt" refers to an obligation incurred by the state, which creates a legal duty on its part to pay from the general fund a sum of money to another, who occupies the position of a creditor, and who has a lawful right to demand payment.[34] It contemplates an obligation which is irrevocable and requires for its satisfaction levies beyond the appropriations made available by the Legislature to meet the ordinary expenses of state government for the fiscal year.[35] "Liability" as used within our constitution, has been afforded a broader and more comprehensive definition. It refers to an obligation one is bound in law or justice to perform.[36] A careful review of the proposed bond issue compels us to conclude that no impermissible state debt or liability will be created by the issuance of the contested revenue bonds.

Respondent is authorized to issue revenue bonds *without* state obligation to finance its water projects.[37] These revenue bonds are required to be payable *solely* out of

". . . revenues of the Idaho water resource board. Such bonds shall be authorized by resolution, which resolution shall create a special fund or funds into which the Idaho water resource board shall obligate and bind the board to set aside and pay any part or parts of, or all

33. *Lewis v. Brady*, 17 Idaho 251, 258, 104 P. 900, 902 (1909).

34. See *Lewis v. Brady, supra* note 33. *See also Burnham v. City of Milwaukee*, 98 Wis. 128, 73 N.W. 1018, 1019 (1897) ; *Board of State Harbor Com'rs v. Dean*, 118 Cal.App. 2d 628, 258 P.2d 590 (1953) ; 72 A.L.R. 687 (1931).

35. *See Stein v. Morrison*, 9 Idaho 426, 449–50, 75 P. 246, 254 (1904) ; *Lyons v. Bottolfsen*, 61 Idaho 281, 291, 101 P.2d 1, 5 (1940).

*See also State v. Yelle*, 65 Wash.2d 660, 399 P.2d 319, 324 (1965) ; *State ex el. University of Utah v. Candland*, 36 Utah 406, 104 P. 285, 292 (1909).

36. *See Hanson v. City of Idaho Falls*, 92 Idaho 512, 514, 446 P.2d 634, 636 (1968) and cases cited therein.

37. Art. XV, § 7 ; I.C. § 42–1734(h), (s) ; I.C. § 42–1739, § 42–1740, § 42–1741, § 42–1742.

of, or a fixed proportion of, or a fixed amount of the available revenue of the bond sufficient to pay the principal of and interest on such bonds as the same shall become due and, if deemed necessary, to maintain adequate reserves therefor. No appropriated moneys shall be paid into such special fund or funds. Such fund or funds shall be drawn upon for the sole purpose of paying the principal of and interest on bonds issued pursuant to this act. . . . "[38]

The revenue bonds and any coupons attached to them are also required to state upon their face that they are payable solely from such special fund, or funds.[39]

Pursuant to this authority, respondent has proposed to issue revenue bonds to finance the cost of constructing its share of the Swan Falls-Guffey Project. The indenture of trust for the issuance of these bonds states in part:

"This Bond and such other Bonds of the series of which it forms a part are issued pursuant to and in full compliance with the Constitution and laws of the State of Idaho, particularly Sections 42–1739 to 42–1749, inclusive, Idaho Code, as supplemented and amended, and pursuant to resolution adopted and approved by the Board, which resolution authorizes the execution and delivery of this Bond and the Indenture. This Bond and the series of which it forms a part and the interest coupons appertaining hereto are special obligations of the Board and are payable solely from the Pledged Revenues and other amounts derived from the leasing of the Leased Project and otherwise from time to time deposited into a special fund created by the Board and designated 'Idaho Water Resource Board Swan Falls-Guffey Project Bond Fund', but not including the Development Fund Payment and the Additional Development Fund Payment payable to

the Board by the Lessee under Sections 10.2 and 10.5 of the Swan Falls-Guffey Agreement, as provided in the Indenture, resolution, Swan Falls-Guffey Agreement and the Lease. The Bonds and the interest coupons appertaining thereto do not now and shall never constitute an indebtedness to which the full faith and credit of the Board is pledged. Pursuant to the provisions of the Swan Falls-Guffey Agreement and the Lease, rental payments sufficient for the prompt payment when due of the principal of, premium, if any, and interest on the Bonds are to be paid by the Lessee to the Trustee for the account of the Board and deposited in the aforesaid special fund created by the Board and designated 'Idaho Water Resource Board Swan Falls-Guffey Project Bond Fund', and such rental payments have been duly pledged for that purpose."

It is evident from the terms of the indenture of trust that no impermissible debt or liability will be created by the issuance of these revenue bonds since

1) the principal and interest on the revenue bonds will be payable solely from the payments made by the intervenor to respondent in the form of rent for use of the dams and,

2) should these rental payments prove insufficient to meet all charges as they come due, respondent cannot levy or collect taxes, encumber its property, nor resort to the general fund to offset any deficiencies.[40]

Appellant argues that the *Feil* case compels a contrary result. In *Feil,* the issue before the Court was whether a city ordinance which provided for the issuance of bonds to finance the purchase by the city of Coeur d'Alene of a water works system from Consumers Company Limited, was violative of art. VIII, § 3 of the Idaho Con-

38. I.C. § 42–1742.

39. *Id.*

40. *See Board of County Com'rs v. Idaho Health Fac. Auth., supra* note 25; *Lloyd v. Twin Falls Housing Auth.,* 62 Idaho 592, 113 P.2d 1102 (1941).

stitution. As then applicable this constitutional provision provided:

*"Limitations on county and municipal indebtedness.*—No county, city, town, township, board of education, or school district, or other subdivision of the state, shall incur any indebtedness, or liability, in any manner, or for any purpose, exceeding in that year, the income and revenue provided for it for such year, without the assent of two-thirds of the qualified electors thereof voting at an election to be held for that purpose, nor unless, before or at the time of incurring such indebtedness, provision shall be made for the collection of an annual tax sufficient to pay the interest on such indebtedness as it falls due, and also to constitute a sinking fund for the payment of the principal thereof, within twenty years from the time of contracting the same. Any indebtedness or liability incurred contrary to this provision shall be void: provided, that this section shall not be construed to apply to the ordinary and necessary expenses authorized by the general laws of the state."

The principal and interest on the bonds to be issued by the city were to be payable solely from a special water works fund, which was to consist of revenues generated from the operation of the water works system in the city.

The Court concluded that the city ordinance was repugnant to art. VIII, § 3 of the State Constitution. It held that the bond issue proposed by that ordinance would create a "liability" against the city without complying with the requirements set out in the Constitution for incurring liabilities. No "indebtedness" was found to exist.

The *Feil* case is distinguishable from the present appeal, in that in *Feil,* the Court was concerned with a challenge brought under art. VIII, § 3 of the State Constitution; whereas in the present appeal the challenge is to a different constitutional provision, art. VIII, § 1. Furthermore any doubt as to the precedential value of the *Feil* opinion has been removed by subsequent amendments by the people of this state to art. VIII, § 3, which now authorize a municipality to do what was impermissible at the time that case was decided.[41]

In *Enking,* the Court found invalid as violative of art. VIII, § 1, a legislative act authorizing the state water conservation board to:

" . . . provide, by resolution, at one time or from time to time, for the issuance of Water Conservation Revenue Bonds of the state for the purpose of paying the cost as hereinabove defined of any one or more such works, the principal and interest of which bonds shall be payable solely from the special fund herein provided for such payment. Such bonds shall mature at such time, or times. not more than forty (40) years from their date, or dates, as may be fixed by such resolution, but may be made redeemable before maturity at the option of the state, to be exercised by the Board, at such price or prices, and under such terms and conditions as may be fixed by the Board prior to the issuance of the bonds."

With the amendment to the State Constitution in 1964, allowing for the creation of a state water resource agency with the power, among others, to issue revenue bonds without state obligation, it is clear that the precedential value of *Enking* has been totally eroded. Whatever constitutional impediment existed at the time *Enking* was decided for the issuance by a state water agency of revenue bonds without state obligation, to be paid solely from revenues generated by the operation of a project, has been removed with the enactment of art. XV, § 7.

Appellant next argues that chapter 265, as amended, and the agreement, as amended, constitute a violation of the due process clause provision of art. I, § 13 of

41. *See Schmidt v. Village of Kimberly,* 74 Idaho 48, 256 P.2d 515 (1953).

the State Constitution because the proposed joint venture arrangement is not for a "public purpose." Appellant contends that this provision of the Constitution requires that any activity engaged in by the state be for some public purpose. In appellant's view, the proposed undertaking does not effectuate a public purpose because the state is being placed in a position of constructing dams for the sole purpose of leasing them to a privately owned and operated company, with no showing that the state must construct the dams and lease them to the intervenor in order to adequately provide for its inhabitants. We do not agree with this argument.

It is a fundamental constitutional limitation upon the powers of government that activities engaged in by the state, funded by tax revenues, must have primarily a public rather than a private purpose.[42] A public purpose is an activity that serves to benefit the community as a whole and which is directly related to the functions of government.[43] The development and conservation of the state's water resources has long been recognized as constituting a necessary public purpose.[44] Such a public purpose is evident in this case.

In addition, the Legislature in enacting chapter 265, as amended declared:

"SECTION 1. The legislature finds and declares that the development of the Grandview-Guffey Reach of the Snake River by the Idaho water resource board is in the public interest and that it is a public purpose that the Idaho water resource board exercise the powers authorized in sections 2, 3, 4, 5 and 6 of this act to:

(a) maximize the recreational potential, development of fish and wildlife habitat, and uses of the water resources of Idaho;

(b) facilitate irrigation of the arid lands of Idaho by providing means of utilizing the water resources of Idaho; and

(c) by contributing to the development of necessary electrical energy for use in the Ada-Canyon County area of southwest Idaho, achieve economy in the generation of electricity through the use of water resources thereby meeting the future power needs of the state of Idaho and its inhabitants."

This declaration by the Legislature of public purpose is normally afforded great deference, although it is by no means binding or conclusive upon this Court. It will not be overturned, however, unless it is found to be arbitrary or unreasonable.[45] We are not convinced that such is the situation in the present appeal.[46]

Appellant next argues that the state in this proposed undertaking is loaning its "credit" to the intervenor, and that this is contrary to the prohibition contained in art. VIII, § 2 of the Idaho Constitution. Appellant places primary reliance upon this Court's decision in *Village of Moyie Springs, Idaho v. Aurora Mfg. Co.*[47] We

42. *Board of County Com'rs. v. Idaho Health Fac. Auth.*, *supra* note 25. For an historical analysis of the origin of the "public purpose" doctrine, *see* Note, Incentives to Industrial Relocation: The Municipal Industrial Bond Plans, 66 Harv.L.Rev. 898, 900–01 (1953); Note, Legal Limitations on Public Inducements to Industrial Location, 59 Colum.L. Rev. 618, 622–23 (1959).

43. *See Visina v. Freeman*, 252 Minn. 177, 184, 89 N.W.2d 635, 643 (1958).

44. *Nelson v. Marshall*, 94 Idaho 726, 497 P. 2d 47 (1972) and cases cited therein.

45. *See Board of County Com'rs. v. Idaho Health Fac. Auth.*, supra note 25, 96 Idaho at 502, 531 P.2d at 592.

46. The fact that the intervenor benefits from the Swan Falls-Guffey Project in an incidental fashion in that it will be able to sell electrical power generated by the Swan Falls-Guffey Project to the public and enjoy a profit in so doing does not defeat the public purpose of the joint venture undertaking. Where the primary purpose of a program is public, ". . . any incidental benefits to profit-making enterprises, . . . will not invalidate the program." *Id.*

47. 82 Idaho 337, 353 P.2d 767 (1960).

**560**

believe appellant's reliance upon that case is misplaced.

Art. VIII, § 2 of the State Constitution provides in pertinent part:

"2. *Loan of state's credit prohibited— Holding stock in corporation prohibited —Development of water power.*—The credit of the state shall not, in any manner, be given, or loaned to, or in aid of any individual, association, municipality or corporation; . . . "

The history of this constitutional provision,[48] and others of its kind adopted in our sister states is well known. As stated succinctly in one law review article:

"In the nineteenth century, the United States was enjoying a rapid westward expansion. A key element in this expansion was the construction of railroads and other communication and transportation systems, the routes of which vastly influenced growth. An adjacent railroad was often crucial to the economic growth, if not the very existence, of many localities. As a result, state and local governments, in order to encourage specific routes and spurs, offered financial assistance to struggling railroads. This assistance was not entirely without precedent in light of earlier successes with similar projects such as the Erie Canal. Governmental assistance usually took the form of stock or security purchases, or co-signatures on bonds issued by railroads. Since these private ventures were at best highly speculative, many failed, leaving governmental units, and thus the taxpayer, either holding worthless stock certificates or, even worse, liable for large inadequately se-

cured debts. During the depression of 1837 nine states defaulted on, or repudiated, debts of this type. These repudiations were made easier because a significant portion of the debt certificates were held by European investors who desired a stake in the American adventure.

"The resulting economic crisis led to the passage of constitutional provisions designed to limit state indebtedness and restrict governmental involvement in private ventures. Forty-five state constitutions contain provisions prohibiting the lending of credit; . . . "[49]

In the case of *Engelking v. Investment Bd.*,[50] this Court construed art. VIII, § 2 of the State Constitution as follows:

"The word 'credit' as used in this provision (art. VIII, § 2) implies the imposition of some new financial liability upon the State which in effect results in the creation of State debt for the benefit of private enterprises. This was the evil intended to be remedied by Idaho Const. art. 8 § 2, and similar provisions in other state constitutions."[51]

The Court later on in the opinion added:

"The credit clause of Idaho Const. art. 8, § 2 is intended to preclude only State action which principally aims to aid various private schemes."[52]

▮ .We have previously decided that no state "debt" or "liability" for the benefit of a private enterprise will be created by respondent's proposed bond issuance. On the contrary, the bonds themselves clearly show that the state is *not* placing its faith or credit behind their payment. The bonds are to be retired out of reve-

**48.** *See Boise Redevelopment Agency v. Yick Kong Corp.*, 94 Idaho 876, 883–884, 499 P.2d 575, 582–583 (1972).

**49.** Comment, State Constitutional Provisions Prohibiting the Loaning of Credit to Private Enterprise—A Suggested Analysis, 41 Univ. of Colo.L.Rev. 135, 136 (1969). *See also* Pinsky, State Constitutional Limitations on Public Industrial Financing: An Historical and Economic Approach, 111 Univ. of Pa.L. Rev. 265, 277 (1963).

**50.** 93 Idaho 217, 458 P.2d 213 (1969).

**51.** *Id.* at 221–222, 458 P.2d at 217–218. *See also Hansen v. Independent S. Dist. No. 1*, 61 Idaho 109, 98 P.2d 959 (1939).

**52.** 93 Idaho at 222, 458 P.2d at 218. *See also Davis v. Moon*, 77 Idaho 146, 153, 289 P.2d 614, 618 (1955).

nues generated from the Project only. Under no circumstances can a tax be levied or public property be encumbered to help pay any part of the bond issue. Prospective bond purchasers are put on notice that they have no payment recourse against any public entity. Furthermore, not only is the proposed issuance of revenue bonds by respondent not a loaning of the state's credit, as that term has been interpreted, but the contemplated bond issue is not " . . . in aid of any . . . corporation . . . " within the meaning of that prohibition contained in art. VIII, § 2. The principal benefits of the project inure to the public. Any benefit to the intervenor is secondary and incidental. We therefore hold that the joint venture arrangement does not contravene the prohibition on the loaning of state credit expressed in art. VIII, § 2.

We do not believe the *Moyie Springs* case compels us to reach a contrary conclusion. There are significant distinctions between the facts of that case and the circumstances of the present appeal which make the *Moyie Springs* decision inapposite.

In *Moyie Springs,* at issue was a state statute which authorized municipalities to issue revenue bonds for the purpose of financing the cost of acquiring land and constructing facilities which were to be sold or leased to private enterprises. The village of Moyie Springs acting pursuant to this statute, passed an ordinance providing for the issuance of revenue bonds to defray its cost of acquiring a site, and constructing an industrial plant which it planned to lease to the Aurora Manufacturing Company for a term of thirty years. When Aurora Manufacturing Company questioned the legality of the proposed arrangement and refused to perform its part of the agreement, the village brought an action for a declaratory judgment, to adjudicate both the rights of the parties, and the constitutionality of the statute and ordinance.

This Court found both the statute and ordinance to be invalid. It ruled that the proposed revenue bond issue was violative of the constitutional restriction against a municipality loaning its credit in aid of a private corporation. In addition, the proposed venture was found to have only an incidental or indirect benefit to the public. In reaching its conclusion, the Court was particularly concerned with the spectre of a state or one of its subdivisions promoting, sponsoring or regulating one private commercial or industrial enterprise to the detriment of others in the field, and the effect such a dangerous precedent would have upon the free enterprise system:

> "It is obvious that private enterprise, not so favored, could not compete with industries operating thereunder. If the state-favored industries were successfully managed, private enterprise would of necessity be forced out, and the state, through its municipalities, would increasingly become involved in promoting, sponsoring, regulating and controlling private business, and our free private enterprise economy would be replaced by socialism."[53]

In the situation before us, there is no effort by the state to single out one private commercial or industrial enterprise in competition with several others in the field for preferential treatment or favored tax exemption status. Rather, what is involved is a joint cooperative effort between a state agency, and a public utility subject to state regulation, to enhance the production and availability of electrical power, essential to the welfare of all the citizenry of the state. The state is not proposing to engage in or sponsor a project traditionally left to the private domain, as was the situation in *Moyie Springs,* but instead is participating in an activity with a quasi-public entity, to produce a service necessary for the well being of the public. Unlike the *Moyie Springs* case, where the village

53. 82 Idaho at 350, 353 P.2d at 775, *supra* note 47.

sought to purchase the industrial land site and construct the entire facility for the private entity's commercial exploitation, here the state is only financing the cost of its part of the undertaking. The intervenor is responsible for financing the cost of the power generation facilities which it will use at the dam sites. In *Moyie Springs,* the state legislation pursuant to which the village was acting, authorized the municipalities to sell or otherwise dispose of any project upon such terms and conditions as it deemed advisable. There is no comparable provision in the enabling legislation providing for the Swan Falls-Guffey Project, nor is there any section in the agreement, as amended, which allows for the state's interest in the project to be sold or otherwise disposed of. For all of the above-mentioned reasons, we cannot agree with appellant's assertion that there is no real distinction between the present Swan Falls-Guffey Project and the project contemplated in *Moyie Springs.* We have carefully reviewed the additional authority cited by appellant from other jurisdictions and find them to be distinguishable.

Appellant next contends that Chapter 265, as amended, and the agreement, as amended: (1) inferentially grant to the intervenor an exclusive franchise, (2) prevent the Legislature from taking property of the intervenor for public use, and (3) limit the police power of the state, so that the future right to regulate the intervenor in the same manner as every other public utility has been impaired, all in violation of art. XI, § 8 of the Idaho Constitution. Although making these contentions, appellant cites no authority to support his position. We do not agree with these arguments, but will discuss them in the order presented.

(1) Art. XI, § 8 provides as follows:

*"Right of eminent domain and police power reserved.*—The right of eminent domain shall never be abridged, nor so construed as to prevent the legislature from taking the property and franchises of incorporated companies, and subjecting them to public use, the same as the property of individuals; and the police powers of the state shall never be abridged or so construed as to permit corporations to conduct their business in such manner as to infringe the equal rights of individuals, or the general well being of the state."

A "franchise" is generally defined as:

"[A] special privilege conferred by government on [an] individual or [a] corporation, and which does not belong to [the] citizens of [the] country generally of common right."[54]

Section 2, of chapter 265 as amended authorizes respondent to:

" . . . plan, finance, construct, acquire, operate, own, and maintain a water project in the Grandview-Guffey Reach of the Snake River consisting of a dam or dams at sites known as Guffey and Swan Falls, or at such other sites in the Grandview-Guffey Reach of the Snake River as may be approved by the federal power commission, together with all necessary works and facilities for the generation and wholesale of hydroelectric power at the site of production in connection with such water project and together with all other necessary related structures and equipment, and subject to the provisions of this act, to negotiate and to enter into contracts for the wholesale of hydroelectric power at the site of production for sale of power to, . . . "

or as an alternative,

" . . . to enter into joint ventures with one (1) or more privately owned

---

54. Black's Law Dictionary (rev. 4th ed. 1968). *See also Dunmar Investment Co. v. Northern Natural Gas Co.,* 185 Neb. 400, 176 N.W.2d 4 (1970); *City of Englewood v. Mountain States Tel. & Tel. Co.,* 163 Colo. 400, 431 P.2d 40 (1967); *In Re South Lakewood Water Company,* 61 N.J. 230, 294 A.2d 13 (1972).

electric utility companies or other entities, public or private for the construction and installation in or adjacent to such dams by such privately owned electric utility company or other entities of works and facilities necessary to the generation of electric power and for the transmission thereof, and to make such plans and enter into such contracts and agreements as are necessary or appropriate for such construction or such joint ventures, . . . ”

We find nothing in this legislation which confers upon the intervenor a "franchise" as that term is defined. Respondent was not compelled to contract with intervenor, but rather could have chosen to arrange to enter into a joint venture arrangement with another privately owned utility company, or another entity, public or private. Nor do we find anything in the agreement, as amended, which grants to the intervenor a "franchise." The intervenor has been granted only a contractual right under the agreement, as amended, secured by an annual rental or lease payment, to use two dams to be built and owned by a state entity. The lease of state owned property to a private party does not constitute the issuance of a "franchise."

■ (2) There is no impermissible limitation either in Chapter 265, as amended, or in the agreement, as amended, on the exercise by the state of its power of eminent domain over property acquired by the intervenor. Should the state find it necessary in the future to condemn the intervenor's property to effectuate a public use, it is not prohibited from so doing, provided it follows the procedures set forth in Idaho law, and furthermore, provided that it makes just compensation for any property taken.

■ (3) Finally, we find no indication, nor has appellant apprised this Court of in what manner, or to what extent, the state's police power to regulate the operations of the intervenor will be abridged should the agreement, as amended, become effective. On the contrary, it is evident that there

has been no abdication of the state's regulatory role in this area. Section 14.7 of the agreement, as amended, provides the necessary safeguards to comply with the language within art. XI, § 8, which prohibits corporations from conducting their business so as " . . . to infringe the equal rights of individuals, or the general well-being of the state." Section 14.7 provides in pertinent part:

*"Applicable Laws, Regulations and Regulatory Authorities.* The Company and the Board agree in their performance of their obligations hereunder to comply fully with all laws, rules and regulations pertaining to the transactions herein contemplated, including particularly the Federal Power Act, the Idaho Public Utilities Act and the rules and regulations of the Federal Power Commission and the Idaho Public Utilities Commission, and to the extent that their operations may be subject to the jurisdiction of any state or federal regulatory agencies, subject to the terms of all valid and applicable orders of any of such agencies. This agreement is subject to the laws of the State of Idaho and is subject to the approval of any state or federal regulatory agency having jurisdiction thereof . . . .”

Thus we find no merit to appellant's final contention.

### V.

Appellant argues that under the provisions of Article III of the agreement as amended, respondent has improperly delegated its authority over the progress and management of the Project to an Administrative Committee over which it has no control, and which has authority to bind respondent in all matters affecting the Project contrary to its wishes. This in appellant's view constitutes an illegal delegation of the legislative, executive or administrative powers of this state.

Article III of the agreement, as amended, provides in pertinent part as follows:

*"Section 3.2. Membership and Functions of Committee.* The Administrative

Committee shall consist of four representatives, two designated by each party, and such representatives shall be authorized by the party by whom he is designated to act on its behalf with respect to those matters herein provided to be responsibilities of the Administrative Committee. The functions and responsibilities of the Administrative Committee shall be (i) to establish general policies to be followed in the administration of this agreement and in the financing, construction, ownership and operation of the Project and (ii) to do such other things as are provided herein and as may be provided for from time to time by amendment of or supplement to this agreement, provided that the Administrative Committee shall have no authority to modify any of the provisions of this agreement except where modification is specified to be within the scope of the Administrative Committee's responsibility. *The establishment of any procedure or practice and any other action or determination by the Administrative Committee shall be made by agreement to become effective when signed by a majority of the members of the Committee. . . .*" (Emphasis added.)

The Administrative Committee was established by the parties to the agreement for the purpose of facilitating the implementation of the joint venture concept for the development of the Grandview-Guffey Reach of the Snake River as authorized by the Legislature. It represents a working arrangement whereby the intervenor and respondent will in a spirit of cooperation confer to establish the procedures and practices to be followed in carrying out the will of the Legislature as announced in Chapter 265, as amended. Any action taken by the Administrative Committee requires approval by a majority of its four members, two of whom at all times must be respondent's representatives. Thus it is clear that the Administrative Committee *cannot* act so as to bind respondent contrary to its wishes.

To the extent the Administrative Committee acts in an advisory capacity, we find no impermissible delegation of authority by respondent. Thus respondent would be free to accept the recommendations of the Administrative Committee as to the policies which would best help to effectuate the Project. However, because the ownership of the Project rests with the state, and the intervenor is only leasing the two dams of the Project from the respondent, respondent must be free to reject any recommendations offered by the Administrative Committee, and make ultimate policy decisions as to the financing, construction, ownership and operation of the Project by itself. Anything less would constitute an unlawful abdication by respondent of its constitutional and statutory responsibilities in this area. The agreement, as amended, must be modified to comply with this requirement in accordance with section 3.3 of said agreement which provides:

> "*Section 3.3. Compliance with Law. . . . If at any time it is determined by a court of competent jurisdiction that any rights or duties assigned to the Administrative Committee under the provisions of this agreement constitute an undue delegation of power of the Board, action shall be taken by the parties hereto in order to comply with the court determination* and, if legally permissible and desirable under the determination of the court, the Board shall be substituted for the two members of the Administrative Committee appointed by the Board, except that in no event shall the Board cast more than two votes in the Administrative Committee." (Emphasis added.)

### VI.

Appellant maintains that the power given to the interim legislative committee under section 4 of Chapter 265, as amended, constituted: (1) an unlawful delegation of legislative authority and (2) a denial of the right of referendum to the people of this state, both in violation of art. III, § 1

of the Idaho Constitution. We are not persuaded by these assertions.

As it relates to appellant's first assertion, art. III, § 1 provides in pertinent part:

> "*Legislative power—Enacting clause—Referendum—Initiative.*—The legislative power of the state shall be vested in a senate and house of representatives. . . ."

In construing this provision, this Court has noted that:

> "[I]t is a doctrine well established and frequently reiterated by the courts that the functions of the Legislature must be exercised by it alone, and that they cannot be delegated, except to the extent and in the manner that may be expressly authorized by the organic law. (Citation omitted) All legislative power in the state government is by article 3 of the Constitution vested in the Senate and House of Representatives, and since the lawmaking power is assigned to the Legislature, it is a fundamental principle of representative government that, except as authorized by the Constitution, the Legislature cannot delegate any of its power to make laws to any other body or authority." [55]

As stated by Cooley, in his treatise on Constitutional Limitations:

> "One of the settled maxims in constitutional law is, that the power conferred upon the legislature to make laws cannot be delegated by that department to any other body or authority. Where the sovereign power of the State has located the authority, there it must remain; and by the constitutional agency alone the laws must be made until the constitution itself is changed. The power to whose judgment, wisdom, and patriotism this high prerogative has been intrusted cannot relieve itself of the responsibility by choosing other agencies upon which the power shall be devolved, nor can it substitute the judgment, wisdom, and patriotism of any other body for those to which alone the people have seen fit to confide this sovereign trust." [56]

We do not believe that section 4 of chapter 265, as amended, constitutes an unlawful delegation of the legislative power so as to be violative of art. III, § 1. Section 4 provides as follows:

> "SECTION 4. Any contractual agreement for power sale or joint venture shall be submitted to an interim committee for approval by a majority of such committee, if such committee is appointed and, in any event, subject to veto by action by the second regular session of the forty-first legislature; provided that, if no such veto takes place, the contract or contracts shall be in full force and effect according to the terms at the end of such second regular session of the forty-first legislature."

This provision does not represent an attempt by the Legislature to abdicate its general law making power. The interim committee which was established by the Legislature was given no law making authority. Rather, its authority was limited to reviewing any agreement submitted to it by respondent for the development of the *Grandview-Guffey Reach of the Snake River*, and reporting its recommendation to the entire Legislature. This preliminary review by an interim committee was deemed necessary to assure that the previously declared policies of Chapter 265, as amended would in fact be carried out.

It is evident that section 4 of Chapter 265, as amended was adopted because the Legislature felt a need for careful review of any contractual arrangement entered into by respondent for the development of the Grandview-Guffey Reach of the Snake

---

55. *State v. Nelson*, 36 Idaho 713, 720, 213 P. 358, 360 (1923). *See also Boise Redevelopment Agency v. Yick Kong Corp.*, 94 Idaho 876, 499 P.2d 575 (1972), *supra* note 48.

56. 1 Cooley, A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union 224 (8th ed. 1927).

River prior to the time any work was undertaken. In furtherance of this objective, the Legislature established a committee consisting of its *own* members, to pass upon and make recommendations to the entire legislative body as to the propriety of accepting any proposed arrangement submitted by respondent. The Legislature had the final decision as to whether the proposed agreement would be accepted or rejected. A resolution was in fact introduced in the State Senate to veto the agreement but this resolution was defeated.[57] No vote was taken by the State House of Representatives with regard to a possible veto as a veto measure did not receive affirmative action in the state Senate.

We conclude that the creation of this interim committee by the Legislature, composed of its own members, with no law making authority, but rather with the duties of reviewing agreement proposals submitted to it by respondent, and making recommendations as to whether the submitted agreement warranted approval, did not involve any unconstitutional delegation of legislative power.[58] Our Constitution does not prohibit the Legislature from assigning such incidental and ancillary tasks to a committee of its own members.

Appellant next contends that section 4 of Chapter 265, as amended, unlawfully limited the right of the people of this state to void by referendum the entire chapter, by stating that the agreement would become valid at the end of the Second Regular Session of the Forty-First Legislature. Appellant argues that art. III, § 1 grants to the people the right to veto any act of the Legislature *at any time* subsequent to its passage.

As originally enacted and adopted, the Idaho Constitution made no provision for direct legislation. It was not until 1911 that the Constitution was amended to provide for the exercise by the people of this state of the power to propose new laws (initiative) and the power to adopt and veto those laws passed by their representatives (referendum).

As it relates to the power of referendum, art. III, § 1 provides in pertinent part:

"*Legislative power—Enacting clause—Referendum—Initiative.*—The people reserve to themselves the power to approve or reject at the polls any act or measure passed by the legislature. This power is known as the referendum, and legal voters may, under such conditions and in such manner as may be provided by acts of the legislature, demand a referendum vote on any act or measure passed by the legislature and cause the same to be submitted to a vote of the people for their approval or rejection."

This constitutional provision is much more comprehensive and inclusive than its counterpart in our sister states. It makes the entire field of legislative activity subject to review by referendum.[59]

The referendum provision was to be exercised under such conditions and in such manner as was provided by the Legislature. The Legislature allowed the referendum power to lay dormant until 1933. In that year it enacted comprehensive legislation to allow the utilization of the referendum power.

I.C. § 34–1803 was part of the legislation enacted in 1933. It provides:

"*Referendum petitions—Time for filing—When election held—Effective date of law.*—Referendum petitions with the requisite number of signatures attached shall be filed with the secretary of state not more than sixty (60) days after the final adjournment of the session of the state legislature which passed on the bill on which the referendum is demanded.

57. *Supra* note 6.

58. *Cf. Parker v. Riley*, 18 Cal.2d 83, 113 P. 2d 873 (1941) ; *Vita-Pharmacals v. Board of*

*Pharmacy*, 110 Cal.App.2d 826, 243 P.2d 890, 893 (1952).

59. *See Johnson v. Diefendorf*, 56 Idaho 620, 638, 57 P.2d 1068, 1076 (1936).

All elections on measures referred to the people of the state shall be had at the biennial regular election. Any measure so referred to the people shall take effect and become a law when it is approved by a majority of the votes cast thereon, and not otherwise."

It is clear from this statute that the referendum power may not be exercised at *any* time as appellant argues. Rather, referendum petitions shall be filed ". . . not more than sixty (60) days after the final adjournment of the session of the state legislature which passed on the bill on which the referendum is demanded."

 There is nothing in Chapter 265, as amended, which in any way inhibited the exercise of the referendum power by the people of this state had the necessary petition with the requisite number of signatures been filed with the Secretary of State within the statutorily prescribed time limit. It is clear that had such a petition been submitted, the operation of Chapter 265 would have been held in abeyance until the decision by the people in the referendum vote.

## VII.

 Appellant assails three sections of the agreement, as amended:

(1) Section 5.3 for failure to establish standards for allocating costs and for determining ownership of the facilities;

(2) Section 6.1 for authorizing the use of public monies to reimburse intervenor for its expenses in obtaining a Federal Power Commission license; and

(3) Section 6.5 for authorizing the use of public monies for the repayment of interest on advances made by the intervenor for respondent's share of the Project.

It is unnecessary to deal with these contentions at great length.

Section 5.3 does adequately set forth guidelines for determining ownership interests of the intervenor and respondent to the facilities of the Swan Falls-Guffey Project and for assigning cost responsibilities to the respective parties. Section 6.1 when read in conjunction with section 7.1 of the agreement, as amended, limits the intervenor's reimbursable expenses to those advancements related to the "Project," i. e., those expenses borne by the intervenor which relate to that part of the joint venture which belongs to respondent. Intervenor must bear the expenses for obtaining cost estimates, studies, licenses, permits, plans and specifications, construction contracts and other items necessary for the construction of its part of the joint venture—the power plants. Section 6.5 authorizes the Administrative Committee to prepare an estimate of the costs of the Project after receiving bids for its construction and equipment but prior to the sale of the first series bonds. This estimate of Project costs is to consist of among other things,

"(iii) Other costs incurred in connection with the construction, installation and acquisition of the Project for:

. . . . . .

"(f) All costs representing interest on advancements made by the Company (intervenor) in connection with the construction, installation and acquisition of the Project prior to the issuance of the First Series Bonds."

Since respondent is responsible for financing the cost of the dams, fish and wildlife facilities and recreational facilities which together constitute the Project, there is nothing impermissible in authorizing reimbursement to the intervenor of interest on advances it makes in connection with expenses that it has no responsibility to bear. *State v. Idaho Power Co.,*[60] relied upon by appellant, is distinguishable from the case at hand and does not compel a contrary conclusion.

## VIII.

Appellant charges that section 14.14 of the agreement, as amended, constitutes the granting of a special privilege or immunity

60. 81 Idaho 487, 346 P.2d 596 (1959).

to the intervenor which cannot be altered, revoked or repealed by the Legislature, in violation of art. I, § 2 of the State Constitution. We do not agree with this argument.

Art. I, § 2 of the Idaho Constitution provides in pertinent part:

*"Political power inherent in the people.—* . . . no special privileges or immunities shall ever be granted that may not be altered, revoked or repealed by the legislature."

In essence, this constitutional provision prohibits the Legislature from granting a special privilege or immunity to any party in such a fashion or manner that it can not be subsequently modified, annulled or declared forfeited. A "privilege" is a particular or peculiar benefit or advantage enjoyed by a person, company, or class, beyond the common advantages of others.[61] An "immunity" is an exemption or freedom from a burden, duty or penalty.[62]

Section 14.14 of the agreement, as amended, provides as follows:

*Section 14.14. Amendment.* Prior to the sale of the First Series Bonds, this agreement shall be subject to amendment by the parties for the purpose of complying with any directive, order or license requirement of the Federal Power Commission or of any other regulatory agency having jurisdiction over the parties and the Swan Falls-Guffey Project, or of any order, judgment or decree of any court of competent jurisdiction, either state or federal. In addition to the foregoing, upon the mutual consent of the parties hereto this agreement may be amended by the execution of an amendatory agreement, except that the substance of Sections 10.2 and 10.6 of this agreement shall not be amended or altered in any way.

Section 10.2 sets forth the method for computing the total annual lease payment that the intervenor is required to make throughout the term of the lease. Section 10.6 provides the guidelines for determining in what manner and for what purposes the "development fund payments" and the "additional development fund payments" made by the intervenor are to be applied by respondent.

Appellant has not demonstrated in what particular fashion Section 14.14 of the agreement, as amended, confers special benefits or advantages upon the intervenor or exempts it from any burdens, duties or penalties. Instead appellant has submitted a general argument to the effect that respondent, in negotiating the terms of the agreement with the intervenor, entered into certain financial obligations, (which are not identified by appellant) which will presumably be enforceable against it, and therefore the authority of the Legislature to subsequently regulate intervenor as a public utility will be restricted as a result of these obligations. In appellant's view, as a consequence of these obligations, the state will be prohibited from applying future regulations to all public utilities of the state equally, thereby giving the intervenor a special privilege or immunity.

There is no indication from the terms of the agreement, as amended, that as a result of the joint venture arrangement, the state has abdicated its right to regulate the intervenor in the future in the same manner and to the same extent as other public utilities. Nor do we construe Section 14.14 of the agreement, as amended, as representing a withdrawal by the state of control over the intervenor's future operations, so as to create in the intervenor a preferred status vis a vis other public utilities in this state. Section 14.14 simply reflects an understanding by the parties that before the

61. Black's Law Dictionary, *supra* note 54. *See also Guthrie Daily Leader v. Cameron,* 3 Okl. 677, 41 P. 635 (1895); *Leatherwood v. Hill,* 10 Ariz. 243, 89 P. 521 (1906); *Daigh v. Schaffer,* 23 Cal.App.2d 449, 73 P. 2d 927 (1937); *Thomas v. Daughters of Utah Pioneers,* 114 Utah 108, 197 P.2d 477,

507 (1948); app. dismissed 336 U.S. 930, 69 S.Ct. 739, 93 L.Ed. 1090 (1949).

62. Black's Law Dictionary, *supra,* note 54; *See also Leatherwood v. Hill, supra* note 61; *Thomas v. Daughters of Utah Pioneers, supra* note 61.

terms of the agreement can be altered, mutual consent to do so must be achieved. In stating that the substance of section 10.2 and section 10.6 may not be amended or altered, section 14.14 seeks to provide both contracting parties certain guarantees which safeguard the integrity of the agreement, as amended. In any event there is no language within section 14.14 of the agreement, as amended, which prevents the intervenor and respondent from amending by mutual consent *that* provision so as to authorize the modification of section 10.2 and section 10.6 should that become necessary or desirable.

It is readily apparent that in agreeing to lease state owned property (dams) to the intervenor for a term of years, respondent has not granted a special privilege or immunity to the intervenor as those terms are used in art. 1, § 2 of our Constitution. To so construe this provision would mean that the state could never lease any of its property without contravening this provision. Obviously any lessee obtains certain rights of possession during the term of a lease. However this does not amount to the granting of an impermissible privilege or immunity. As stated by one court:

"A lease made by a public body, pursuant to statutory authority does not constitute an irrevocable and exclusive grant of special privileges, within the meaning of § 22 of the Constitution. That section is designed to prohibit grants of special privileges where some derogation of or encroachment on public rights is inherent in the grant, and is directed at grants of monopoly and discriminatory privileges made by a legislative body in its sovereign capacity, and is not directed at contracts of a private nature such as leases." [63]

### IX.

Appellant argues that section 10.6 of the agreement, as amended, fails to comply with section 6 of Chapter 265, as amended, in that section 10.6 limits the use of "development fund" and "additional development fund" payments to southwestern Idaho and the service area of the intervenor, while section 6 of Chapter 265 requires that these funds be used throughout the entire state. We do not agree with appellant's argument.

Section 10.6 of the agreement, as amended, provides that the "development fund" payments and the "additional development fund" payments shall be applied by respondent: (1) in connection with one or more of the projects set forth in the Southwest Idaho Water Project Plan in Southwestern Idaho or (2) in the event that all financially feasible projects in the plan for the Southwest Idaho Water Project have been adequately financed or that the plan for the Southwest Idaho Water Project has been officially abandoned, then these funds are to be utilized for water projects involving irrigation in the service area of the intervenor within the State of Idaho. Section 6 of Chapter 265, as amended, provides:

SECTION 6. Each resolution authorizing the issuance of revenue bonds of the Idaho water resource board for the purpose of planning, financing, acquiring, and constructing the water project authorized in section 2 of this act, and each agreement or contract if any there be, providing for a joint venture in the planning, financing, construction, acquisition, ownership, operation, and maintenance of the facilities of the water project with a privately owned electric utility company shall provide that all surplus revenues of the Idaho water resource board derived from the facilities constituting the water project, after the payment of the costs of operation and maintenance expenses of the water project, the establishment and maintenance of a fund for the payment of the principal of and interest on the revenue bonds as the same shall become due, the establishment

63. *Rogers v. City of Mobile,* 277 Ala. 261, 169 So.2d 282, 300 (1964).

and maintenance of adequate reserves therefor, and the establishment and maintenance of such contingency or other funds as the board deems desirable, shall in each year be paid by the Idaho water resource board into a fund to be established and held in the custody of the Idaho water resource board, to be known at the "Idaho Water Resource Development Fund" and shall, together with monies accruing to or earned thereon, be appropriated continuously, set aside, and made available until expended, to be used by the board in the administration of such fund and *in the development of water and related land resources in the state of Idaho.* (Emphasis added.)

The key phrase in section 6 is the requirement that the "Idaho Water Resource Development Fund" be used ". . . in the development of water and related land resources in the state of Idaho." Appellant construes this phrase as requiring that the "Idaho Water Resources Development Fund" be spent *throughout* the state. Respondent counters by arguing that this phrase requires only that this "Fund" be spent to finance projects *within* the state as opposed to without, and in those areas where the state water resource board in its judgment deems most advantageous and necessary to do so. We believe respondent presents the correct interpretation.[64]

■■■■ To adopt appellant's view would amount to an undue interference and intrusion into the discretion vested in respondent under the Constitution[65] and the legislation adopted pursuant thereto,[66] to ascertain the water needs of this state, formulate a state water plan which reflects a response to these needs, and establish priorities in implementing the state water plan. Furthermore, to accept appellant's position could lead to a wasteful and inefficient allocation of the "Idaho Water Re-

sources Fund." The word *throughout* implies "in or to every part [of the state]: from one end to the other: everywhere."[67] If appellant's view prevails, the "Fund" must be allocated to each city, county, geographic region of the state irregardless of the water needs in each area. We do not believe that this was the Legislature's intention. Finally, we note that had the Legislature deemed the agreement, as amended, contrary to the letter or spirit of section 7 of Chapter 265, as amended, it could have exercised its right to veto the agreement as set forth in section 4 of that chapter. Its failure to exercise this power of review and rejection leads us to conclude that section 10.6 of the agreement, as amended, did not violate the mandate of section 6 of Chapter 265, as amended.

### X.

Appellant contends that Chapter 265, as amended, and the agreement, as amended, are both void and unenforceable, and in violation of art. IV, § 18 of the Idaho Constitution, because there is no provision requiring the state board of examiners to approve all claims against respondent. This contention is not well taken.

■■■■ Art. IV, § 18 was enacted by the framers of our Constitution as a safeguard, to insure the validity of claims filed against the state. This provision of the State Constitution provides as follows:

"*Board of examiners.*—The governor, secretary of state, and attorney-general shall constitute a board of examiners, with power to examine all claimes against the state, except salaries or compensation of officers fixed by law, and perform such other duties as may be prescribed by law: provided, that in the administration of moneys in cooperation with the federal government the legislature may prescribe any method of disbursement required to obtain the benefits

---

64. We reach this conclusion despite an opinion of the Idaho Attorney General's Office which arrives at a contrary conclusion. *See* opinion letter to Senator John Peavy, March 14, 1972.

65. Art. XV, § 7.

66. I.C. § 42–1731 *et seq.*

67. Webster's Third New International Dictionary at 2385 (Unabridged ed. 1966).

of federal laws. And no claim against the state, except salaries and compensation of officers fixed by law, shall be passed upon by the legislature without first having been considered and acted upon by said board."

Thus, as a condition precedent to the payment of any claim against the state, (excepting salaries or compensation of officers fixed by law) the claim must be presented to the board of examiners whose duty it is to determine whether the claim submitted is in proper form, properly certified by the state auditor, and within the scope of an enactment providing the appropriation and payable therefrom.[68]

 It is clear that only those claims which if approved by the state board of examiners would be payable from state funds are included within the mandate of art. IV, § 18. Thus in the case of *State v. Musgrave,*[69] this Court held that the disbursement of payments from a state insurance fund (derived for the most part from premiums paid by employers on insurance policies and not from tax money) did not require submission of each claim to the board of examiners.

"The state insurance fund, not being state money, and claims against it not being claims against the state, the state board of examiners has no power or jurisdiction over the expenditure of disbursement thereof, except such as is given to it by the legislature."[70]

We believe the reasoning of that case is sound and must be applied to this case.

### XI.

 In his final assignment of error, appellant contends that the meetings of the Administrative Committee must be open to the public to comply with I.C. § 42–1733(b) and I.C. § 67–2340 *et seq.* Appellant submits there is no language within Article III of the agreem nt, as amended,

which indicates that the meetings of the Administrative Committee will be made public. Therefore, appellant argues absent any such requirement, Article III must be declared void as violative of the aforementioned sections of the Idaho Code. We are not persuaded by this argument.

I.C. § 42–1733(b) provides in pertinent part as follows:

"*Organization.*—The business of the board shall be conducted as follows:

. . . . . .

(b) All meetings at which *official action* is taken by the board shall be open to the public; the board may hold executive sessions at which no official action is taken." (Emphasis added.)

We construe the open public meeting requirement in this provision as applicable only to those meetings of the state water resource board where a quorum of its members is present, and business of an official nature is transacted. The open hearing requirement set forth in this statute is inapplicable to the deliberations of the Administrative Committee.

 Nor do we construe the open public meeting requirement found in I.C. § 67–2340 *et seq.,* as being applicable to the meetings of the Administrative Committee. The purpose of this statutory scheme is set forth in I.C. § 67–2340:

"*Formation of public policy at open meetings.*—The people of the state of Idaho in creating the instruments of government that serve them, do not yield their sovereignty to the agencies so created. Therefore, the legislature finds and declares that it is the policy of this state that the *formation of public policy is public business and shall not be conducted in secret.*" (Emphasis added)

I.C. § 67–2342(1) provides:

"*Governing bodies—Requirement for open public meetings.*—(1) All meetings of a governing body of a public agency

68. *See Rich v. Williams,* 81 Idaho 311, 341 P.2d 432 (1959); *Padgett v. Williams,* 82 Idaho 114, 350 P.2d 353 (1960); *Jewett v. Williams,* 84 Idaho 93, 369 P.2d 590 (1962).

69. 84 Idaho 77, 370 P.2d 778 (1962).

70. *Id.* at 90, 370 P.2d at 786.

**572**

shall be open to the public and all persons shall be permitted to attend any meeting except as otherwise provided by this act."

A "public agency" as used in this statute includes among other entities a ". . . state board . . . ." A "governing body" is defined as:

". . . the members of any public agency which consists of two (2) or more members, with the authority to make decisions for or recommendations to a public agency regarding any matter."

A "decision" is defined as:

". . . any determination, action, vote or final disposition upon a motion, proposal, resolution, order, ordinance or measure on which a vote of a governing body is required, at any meeting at which a quorum is present."

A "meeting" is defined as:

". . . the convening of a governing body of a public agency to make a decision or to deliberate toward a decision on any matter."

It is clear from the terms of Article III of the agreement, as amended, that the Administrative Committee does *not* constitute the governing body of the state water resource board with authority to make decisions for or recommendations to the board as these terms are defined. Nor is this Administrative Committee entrusted with the formation of the public policy of the state water resource board. The policy decision to adopt the Swan Falls-Guffey Project as part of the state water plan was made by respondent, via resolution, after open public hearings were held in those areas of the state which were to be affected by the proposed undertaking. We do not read I.C. § 67-2340 *et seq.* as requiring the Administrative Committee to conduct its business subject to open public hearings.

The judgment of the trial court is *affirmed,* as modified, costs to respondent and intervenor.

McFADDEN, DONALDSON, SHEPARD and BAKES, JJ., concur.